STATE OF CONNECTICUT *v.* LEONARD GANT
(14877)

PETERS, C. J., and BERDON, NORCOTT, KATZ and PALMER, Js.

Argued June 7—decision released August 23, 1994

*Temmy Ann Pieszak,* assistant public defender, for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Robert A. Lacobelle,* former assistant state's attorney, for the appellee (state).

NORCOTT, J. The defendant, Leonard Gant, appeals from his judgment of conviction of murder in violation of General Statutes § 53a-54a (a), felony murder in violation of General Statutes §§ 53a-54a and 53a-134, and carrying a pistol without a permit in violation of General Statutes §§ 29-35 and 29-37 (b). After a hearing in probable cause, the case was tried to a jury, which returned a verdict of guilty on all charges. The trial court rendered a judgment of conviction and sentenced the defendant to a total effective sentence of sixty-five years imprisonment to run consecutively to a sentence that he was then serving. The defendant appealed from the judgment of conviction pursuant to General Statutes § 51-199 (b).

The issues on appeal are as follows: (1) did the trial court properly refuse to include in its instruction to the jury a requested "two inference rule"; (2) is the defendant entitled to a new probable cause hearing because of the state's failure to disclose the statement of an eyewitness to the shooting until she testified at trial; (3) did the trial court properly (a) admit evidence of a threatening charge against the defendant, and (b) refuse to give

a limiting instruction on the proper use of that evidence; (4) did the trial court properly deny the defendant's motion to suppress a gun found near him at the time of his arrest; (5) did the trial court improperly admit, at trial, evidence of an allegedly suggestive and unreliable in-court identification of the defendant made during the probable cause hearing; and (6) did the trial court improperly deny the defendant's motion for a mistrial based upon certain prosecutorial statements made during closing argument. We affirm the judgment of conviction.

The jury could reasonably have found the following facts from the evidence produced at trial. On March 11, 1990, Barbara McKinnon drove her boyfriend, Greg Lagnese, in her mother's car to the P.T. Barnum apartments located in Bridgeport to purchase drugs. Arriving at the P.T. Barnum apartments at about 1:30 a.m., McKinnon stopped where three persons, two African-American females and an African-American male, were standing. Lagnese called out and inquired whether anyone had any "coke." The male, whom McKinnon identified as the defendant, asked Lagnese to exit the car. After Lagnese refused, the defendant approached the passenger side of the car where McKinnon observed his face.

The defendant then asked Lagnese what he wanted. Before receiving a reply, the defendant placed a gun at Lagnese's head and demanded money. Lagnese gave the defendant a $10 bill. Not satisfied with the $10, the defendant began patting down Lagnese's jacket while still holding the gun to his head. He also instructed McKinnon to turn the car off and remove the key from the ignition. In fear for her life, McKinnon complied.

After confirming that Lagnese had no other money, the defendant asked McKinnon for money. She stated that she had none and reached for her purse to hand

it to the defendant. At this point, Lagnese reached out of his window, and the defendant stepped back and fired a gunshot at Lagnese hitting him in the shoulder. Additional shots were fired, after which McKinnon drove Lagnese to the Park City Hospital, where he later died from his wounds.[1] At the hospital, McKinnon met Detective Michael Kozlowsky with whom she returned to the scene of the shooting. Kozlowsky could not find shell casings then or at 7 a.m. that same morning when he conducted another search.[2] Subsequently, Detective David Silva searched McKinnon's car and found three spent bullets. Additional facts will be discussed where relevant to a specific claim made by the defendant.

## I

The defendant first claims that the trial court improperly refused to instruct the jury in the following requested language concerning the concept of reasonable doubt: "If the jury views the evidence in the case as reasonably permitting either of two conclusions—one of innocence, the other of guilt—the jury should of course adopt the conclusion of innocence." The defendant argues that, under the circumstances of this case, the trial court's failure to give the so-called "two inference" instruction rendered the entire charge fatally defective. We disagree.

"A request to charge which is relevant to the issues of the case and which is an accurate statement of the law must be given. A refusal to charge in the exact words of a request will not constitute error if the requested charge is given in substance. *State* v. *Gabriel,*

---

[1] The victim's autopsy report revealed that he had died from "multiple gunshot wounds of [the] trunk and extremities."

[2] Kozlowsky testified at trial that if the homicide weapon was an automatic, shell casings would have ejected and fallen to the ground, while if it was a revolver, the gun would retain the casings.

192 Conn. 405, 418, 473 A.2d 300 (1984); *State* v. *Cooper*, 182 Conn. 207, 211, 438 A.2d 418 (1980)." *State* v. *Casey*, 201 Conn. 174, 178, 513 A.2d 1183 (1986). The ultimate question on appeal is whether the instructions, read in their entire context, "fairly and adequately present the case to a jury in such a way that injustice is not done to either party under established rules of law." (Internal quotation marks omitted.) *State* v. *Tatum*, 219 Conn. 721, 734, 595 A.2d 322 (1991).

In the present case, the defendant challenges only one sentence of an otherwise proper instruction on the concept of reasonable doubt. In essence, he contends that it is *mandatory* for the trial court to give the "two inference" instruction when it is requested by a defendant.

We note at the outset that the defendant refers us to no case, and our research has revealed none, in which we or any federal court have ruled in support of his position.[3] Nonetheless, the defendant argues that our statement in *State* v. *Dyson*, 217 Conn. 498, 504, 586 A.2d 610 (1991); see also *State* v. *Smith*, 219 Conn. 160, 166, 592 A.2d 382 (1991); that the "two inference" instruction is "proper under our case law" translates into a mandatory requirement for the use of this language in a jury charge. In *Dyson*, we held that a "two inference" rule was properly given if it served to benefit the defendant and did not diminish the state's burden of proof and if "[t]he charge as a whole correctly

---

[3] Most cases in other jurisdictions deal with a harmless error analysis when the trial court has given the "two inference instruction" together with appropriate instructions regarding the state's burden of proof. See *People* v. *Cruz*, 172 App. Div. 2d 383, 568 N.Y.S.2d 763 (1991) ("[w]hile such ['two inference'] instructions have been criticized as potentially confusing to the jury, reversal is not warranted where, as here, the charge as a whole conveyed the appropriate burden of proof"); see also *Commonwealth* v. *Howell*, 386 Mass. 738, 740, 437 N.E.2d 1067 (1982); *Commonwealth* v. *Coyle*, 17 Mass. App. 982, 459 N.E.2d 119 (1984).

instructed the jury as to the state's burden of proof"; *State* v. *Dyson,* supra, 504; but we have never mandated that the trial court give this language in an otherwise adequate charge.

The danger of giving the "two inference" instruction in an improper context was highlighted in *United States* v. *Attanasio,* 870 F.2d 809, 818 (2d Cir. 1989), in which the court stated that "standing alone, such language may mislead a jury into thinking that the government's burden is somehow less than proof beyond a reasonable doubt." Id. Further, the Court of Appeals for the Second Circuit has stated that "such an instruction by implication suggests that a preponderance of the evidence standard is relevant, when it is not. Moreover, the instruction does not go far enough. It instructs the jury on how to decide when the evidence of guilt or innocence is evenly balanced, but says nothing on how to decide when the inference of guilt is stronger than the inference of innocence but not strong enough to be beyond a reasonable doubt." *United States* v. *Khan,* 821 F.2d 90, 93 (2d Cir. 1987).

We also reject the defendant's argument that the particular facts of this case necessitated the "two inference" instruction. The defendant contends that the unreliability of the identification of him by the eyewitness, McKinnon, coupled with the retracted inculpatory statement of another witness, Levi Mason,[4] placed this case in such equipoise that it was mandatory for the trial court to give the "two inference" instruction. On the basis of our examination of the record, we disagree with the defendant's characterization of the

---

[4] On the day of the shooting, Levi Mason, an acquaintance of the defendant, gave a written statement to the police implicating the defendant. At trial he retracted the statement, claiming that it was false and that he had made the statement as a result of his anger with the defendant over a personal matter. Mason denied that he was threatened into recanting his statement.

state's case as entirely dependent upon the testimony of McKinnon and Mason. We can discern no reason why the trial court should have treated this case differently from any other in which the defendant deserved an appropriate and just explanation of the state's burden to prove the defendant guilty of every element of the charges against him beyond a reasonable doubt.

In the present case, the trial court repeatedly stressed throughout the trial that the state bore the burden of proving the defendant's guilt beyond a reasonable doubt, and properly instructed the jury on the presumption of innocence. Moreover, it is of no moment that the trial court believed that the defendant's requested charge was unacceptable as a matter of law in Connecticut.[5] Both parties conceded that the trial court's belief was never communicated to the jury.[6]

The trial court properly instructed the jury on the fundamental concepts of the presumption of innocence and the state's burden of proof. Accordingly, we conclude that the charge in its entirety properly and adequately informed the jury as to these fundamental concepts without the need for the defendant's requested "two inference" instruction.

---

[5] In rejecting the defendant's request to charge the "two inference" language the trial court stated, "I don't consider that to be an accurate statement of the law. In any event, I think my charge was abundantly clear."

[6] Similarly, we find no merit to the defendant's claim that the alleged defect in the trial court's instruction was compounded by certain improper statements made by the prosecutor during his closing argument. The defendant contends that improper argument "increases the need for clear, complete and correct instructions . . . ." This argument is unavailing in light of our previous determination that the trial court properly instructed the jury on the presumption of innocence and the state's burden of proof. Moreover, it is clear from the record that the trial court admonished the state and instructed the jury that it was not to consider the improper statements in its deliberations. Accordingly, even if we were to accept the defendant's argument, the improper misstatements could not have misled the jury in this case because it was properly instructed with respect to them.

## II

The defendant next claims that he is entitled to a new probable cause hearing because the state withheld exculpatory evidence in violation of *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). We disagree.

The following facts are relevant to this claim. On May 2, 1990, before the commencement of the probable cause hearing, the defendant moved, pursuant to Practice Book § 741, for disclosure of any exculpatory materials in the state's possession. The state opposed the motion and the trial court denied it as premature, adding that the state had a continuing obligation to disclose exculpatory material to the defense. At the probable cause hearing, the defendant again requested that the state disclose any exculpatory material, particularly the sworn statement that an eyewitness to the shooting, McKinnon, had given to the police on the day of the shooting. The trial court once again denied the defendant's request as premature.

At trial, the state finally disclosed McKinnon's statement in which she described the color of the murder weapon as silver. The color of the alleged murder weapon introduced into evidence at trial was black. This discrepancy was the subject of repeated scrutiny during McKinnon's testimony on cross-examination, redirect and recross-examinations.

The defendant now claims that the state's failure to disclose McKinnon's statement, which contained impeachable information concerning the murder weapon, requires that we grant him a new probable cause hearing. He claims that the state's *Brady* violation wrongfully frustrated his ability to impeach McKinnon, upon whom, according to his argument, the state's entire case rested. We disagree.

Recently, this court reaffirmed the standards by which we analyze *Brady* violation claims in this state. "This court has long held, 'on the basis of *Brady* v. *Maryland* [supra, 373 U.S. 83], and its progeny, that "[s]ince the adversarial probable cause hearing [mandated by article first, § 8, of the Connecticut constitution as amended] . . . is an essential part of a defendant's criminal prosecution, the constitutional obligation to disclose exculpatory material attaches at that time." . . . [I]n *State* v. *Shannon,* 212 Conn. 387, 406, 563 A.2d 646 [cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512] (1989), we held that in order for this court to consider claims of nondisclosure of exculpatory material at a probable cause hearing required by our state constitution, the defendant must demonstrate: "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material." *State* v. *Milner,* 206 Conn. 512, 539, 539 A.2d 80 (1988). We further held, in *Shannon,* that the materiality of such exculpatory evidence is to be determined by utilizing the test set forth in *United States* v. *Bagley,* 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). *State* v. *Shannon,* supra, 406–407. Under the *Bagley* test, nondisclosed exculpatory evidence will be considered material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States* v. *Bagley,* supra, 682. . . . It is well established that "[i]mpeachment evidence as well as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused." *State* v. *Pollitt,* 205 Conn. 132, 142, 531 A.2d 125 (1987); *United States* v. *Bagley,* supra, 676.' *State* v. *McPhail,* 213 Conn. 161, 166–67, 567 A.2d 812 (1989)." *State* v. *White,* 229 Conn 125, 134–35, 640 A.2d 572 (1994).

In the present case, the state does not contest that McKinnon's statement was suppressed or that it was favorable to the defendant. The record is clear that the police had the statement as early as the very day of the homicide; for *Brady* purposes "[p]olice are treated as an arm of the prosecution . . . ." (Internal quotation marks omitted.) *State* v. *White,* supra, 229 Conn. 135; *Demers* v. *State,* 209 Conn. 143, 153, 547 A.2d 28 (1988). The state contends, however, that, under the *Bagley* test, the nondisclosed exculpatory matter was not material in the constitutional sense because there is no reasonable probability that, had there been disclosure, the result of the probable cause proceeding would have been different. We agree with the state.

It is well established that impeachment evidence may be crucial to a defense, especially when the state's case hinges entirely upon the credibility of certain key witnesses. *State* v. *White,* supra, 229 Conn. 136–37. "The rule laid out in *Brady* requiring disclosure of exculpatory evidence applies to materials that 'might well alter . . . the credibility of a crucial prosecution witness.' " *State* v. *Green,* 194 Conn. 258, 266, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985). Still, the seminal test remains whether there exists a "reasonable possibility" that the outcome of the proceeding would have been different had the evidence been disclosed to the defense.

After a careful review of the record, we conclude that there is not a reasonable probability that the disclosure of McKinnon's statement prior to the probable cause hearing would have affected the outcome of that proceeding. The fact that McKinnon, an eyewitness to the crime, described the murder weapon to be a different color, while grist for the cross-examination mill at trial with respect to impeaching her credibility, does not overcome the other abundant evidence supporting the trial court's finding of probable cause. That evidence

consisted of McKinnon's identification of the defendant from her vantage point of a "few feet away" as she sat in the car next to the victim before, during and after he was shot on March 11, 1990, and her in-court identification of which she was "[v]ery close to a 100 percent sure." The other incriminating evidence introduced at the hearing consisted of: (1) the murder weapon, which was found under a couch in the same room in which the defendant was apprehended and arrested by the Bridgeport police; (2) the spent bullets that were found in McKinnon's vehicle and those that the state medical examiner removed from the victim's body; and (3) the opinion of the state's ballistics expert[7] that the aforementioned bullets had all been fired from the gun found near the defendant.

We conclude that the trial court's finding of probable cause that the defendant shot the victim during an attempted robbery rested on an abundance of evidence. Contrary to the defendant's assertion, the state's case at the probable cause hearing was not entirely dependent on McKinnon's testimony and credibility. Her testimony at the hearing was not replete with the "many troubling inconsistencies" of which this court made note in *State* v. *White,* supra, 229 Conn. 139. Even if the defense had had McKinnon's prior inconsistent statement regarding the color of the murder weapon during the probable cause hearing, and had used this information for cross-examination purposes as was done at trial, it is not reasonably probable that, in view of the other evidence presented by the state at the probable cause hearing, this information would have affected the ultimate outcome of that proceeding. Because we determine that confidence in the outcome of the probable cause hearing has not been undermined,

---

[7] The defendant's counsel stipulated to the expertise of the state's ballistics expert, Edward McPhillips of the Connecticut state police, for the purposes of the probable cause hearing.

the failure of the state to disclose the exculpatory evidence at the probable cause hearing did not deprive the defendant of his constitutional right to a fair trial. Following the analysis of *Brady* violations employed in *State* v. *McPhail,* supra, 213 Conn. 161, we conclude that a new probable cause hearing is not warranted.[8]

## III

The defendant next claims that the trial court improperly (a) admitted evidence of a threatening charge and the circumstances of his arrest, and (b) failed to give instructions regarding consciousness of guilt to limit the jury's use of the threatening and arrest evidence.[9] He contends that without proper instructions the jury could only have considered the threatening evidence as evidence of bad character because the trial court failed to address the circumstances of the defendant's apprehension and arrest as evidence of consciousness of guilt. He finally claims that the trial court's actions were prejudicial and harmful and denied him a fair trial. We are not persuaded by these arguments.

The following facts form the basis of this claim. On March 31, 1990, Bridgeport police officers David

[8] The defendant also urges that we overrule *State* v. *McPhail,* supra, 213 Conn. 161, and establish a per se rule that any suppression of *Brady* material requires a new probable cause hearing. We decline this invitation to reject the sound test for analyzing *Brady* violations set forth in *McPhail,* recently reaffirmed in *State* v. *White,* supra, 229 Conn. 134–35. We disagree with the defendant's assertion that "*McPhail* renders the duty to disclose *Brady* material prior to the [probable cause hearing] a hollow shell . . . " and that the *McPhail* standards are irreconcilable with the recognition that "appellate review of the determination of probable cause is essential to fulfilling the purpose of amendment seventeen [article first, § 8, of the Connecticut constitution]." *State* v. *Mitchell,* 200 Conn. 323, 331, 512 A.2d 140 (1986).

[9] The defendant does not challenge the introduction of evidence: (1) that the murder weapon was found in the bedroom where the Bridgeport police apprehended the defendant; or (2) that a resident of the P.T. Barnum apartments saw him with a gun in his possession shortly before the police recovered the murder weapon.

Santos and Cornetha Padgett responded to a complaint from Crystle Riddick, then a resident of the P.T. Barnum apartment complex. Riddick, who told the officers that she had known the defendant "all of her life," reported that she had just seen the defendant with a gun in his hand and that he could probably be located in building 15, apartment 106. Riddick also described the clothing worn by the defendant. On cross-examination, Riddick revealed that she had also told the officers that the defendant had pulled a gun on her before entering the apartment building.

Santos and Padgett decided to call for additional backup units, but first proceeded to a nearby fire station at which they were met by Sergeant John Whalen and Officer Paul Domingos. At the firehouse the four discussed the existence of an outstanding warrant for the defendant's arrest for the felony murder of Lagnese. Thereafter, these officers went to building 15 and proceeded to apartment 106.[10]

As Santos and Padgett made their way to the apartment door, Whalen and Domingos went to the rear of the building to prevent an escape. Whalen was very familiar with the layout of the buildings and knew the location of apartment 106. All officers were in portable radio contact with one another. As Santos and Padgett arrived at the front door of apartment 106, Whalen radioed that someone was attempting to climb out of a window in the rear of apartment 106, but upon seeing the police had reentered the apartment. Upon receiving this information, Padgett and Santos entered the apartment, where the defendant was arrested after he was found hiding in a rear bedroom.

At trial the defendant objected on multiple grounds to the admission of any evidence concerning the

---

[10] Santos testified at trial that, although the police were aware of the warrant to arrest the defendant for felony murder, they principally went to the apartment to investigate Riddick's complaint.

threatening incident and the circumstances of his arrest.[11] The state responded that this evidence was relevant to the jury's understanding of how the police had arrived at the apartment building and ultimately arrested the defendant.[12] The trial court agreed with the state and overruled the defendant's objection. Later, the defendant moved for a mistrial on the ground that the admission of the challenged evidence denied him a fair trial. This motion was denied by the court.

## A

We first address the defendant's claim as it pertains to the threatening incident involving Riddick. A review of the record reveals that Riddick never testified before the jury about the specifics of the threatening complaint, namely, that the defendant had threatened her with a gun over a $2 debt. The trial court, in fact, sustained the defendant's objection to police officer Padgett's statement that Riddick had related that she had been threatened. During the direct examination of Riddick, the state also limited itself to testimony that informed the jury of the initial complaint that had brought them to the P.T. Barnum apartments and of the fact that Riddick had seen the defendant, with a gun in his hand, enter a certain building.

Only on cross-examination did Riddick respond spontaneously that the defendant had pulled a gun on

---

[11] Specifically, the defendant objected to the threatening testimony as irrelevant, more prejudicial than probative, hearsay, speculative, improper prior misconduct evidence, and inadmissible evidence of consciousness of guilt because there was nothing to suggest that the defendant's actions allegedly indicating consciousness of guilt related to the homicide rather than the threatening charge.

[12] The prosecutor's argument to the trial court was, in pertinent part: "[T]he jury has a right to know why the officers were there and what prompted them to go to that location because that is relevant. The circumstances there are relevant. When you put it in context of where the weapon was seized, the defendant's conduct when the officers came in and what occurred inside the apartment, it is relevant. . . ."

her.[13] The defendant neither objected nor asked that this remark be stricken. Further, Whalen's reference to the threatening complaint was brief, innocuous and made in conjunction with his testimony that he and the other police officers were aware that the person for whom they were looking was the subject of an active warrant for felony murder.

"The trial court has broad discretion to determine the relevancy of evidence, and we will not disturb a trial court's ruling on the admissibility of evidence in the absence of a clear abuse of discretion. *State* v. *Holliman,* 214 Conn. 38, 50, 570 A.2d 680 (1990)." *State* v. *Sauris,* 227 Conn. 389, 407, 631 A.2d 238 (1993). We are persuaded that the limited evidence of the threatening complaint admitted at trial was relevant to give the jury an understanding of the factual predicate that preceded the search for the murder weapon and the defendant's arrest and that the evidence did not prejudice the defendant's right to a fair trial. In sum, the limited testimony regarding the threatening complaint merely helped explain to the jury the events that led the police to the scene of the defendant's arrest.

We also reject the defendant's assertion that this evidence constituted "prior misconduct" or "bad character" evidence that prejudiced the defendant. The state never offered this evidence for the purposes argued by the defendant on appeal, and the trial court never gave such instructions to the jury. The defendant therefore cannot prevail on this claim.

B

We next consider the defendant's contention that the trial court improperly admitted evidence regarding the

---

[13] The defense attorney's relevant colloquy with the witness was as follows:

"Mr. Holden: How long did you stay with the police that day?

"A: Just long enough to tell them that [the defendant] pulled a gun on me and that was it."

other circumstances of his arrest that was irrelevant. We disagree with the defendant's contention.

It is axiomatic that one fact is relevant to another fact whenever, according to the common course of events, the existence of one, taken alone or in connection with other facts, renders the existence of others either certain or more probable. *State* v. *McClendon,* 199 Conn. 5, 8–9, 505 A.2d 685 (1986). All that is required is that the evidence in question tends to support a relevant fact. *State* v. *Miller,* 202 Conn. 463, 482, 522 A.2d 249 (1987). Simply put, we disagree with the defendant's assertion that, in the context of this case, evidence of (1) the complaint that led the police to the building in which the defendant was found hiding, (2) the outstanding warrant for the defendant's arrest for the felony murder of Lagnese, and (3) the events that led to the discovery, in the same room in which the defendant was arrested, of the gun that was later determined to be the murder weapon by a ballistics expert, was not relevant.

The circumstances of the defendant's arrest were logically and temporally connected to the police investigation and pursuit of Lagnese's killer, for whom they had an active warrant in the name of the defendant. Further, the circumstances of the arrest were instrumental to the jury's understanding of the defendant's relationship to the gun found at the time of his arrest, which the state alleged to be the murder weapon. The trial court's admission of the testimony regarding the circumstances of the defendant's arrest merely allowed the jury to understand a chronological sequence of significant factual events that were a part of the apprehension and identification of the defendant and the seizure of the weapon used in Lagnese's murder. We therefore find no merit to the claim that the admission of evidence of the circumstances of the defendant's arrest was improper.

## C

We next consider the defendant's claim that the trial court improperly failed to instruct the jury regarding consciousness of guilt in order to guide the jury in its use of the evidence regarding the threatening of Riddick and the circumstances of the arrest. Although the state argued, outside the presence of the jury, that the evidence was relevant to the defendant's consciousness of guilt, the trial court, as previously noted, properly admitted the pertinent evidence as relevant to the identification and apprehension of the defendant, and his connection with the murder weapon. Furthermore, neither the state nor the defendant made a request to charge on consciousness of guilt. Accordingly, we conclude that the trial court's failure to render "consciousness of guilt" instructions to the jury was not improper. The defendant's third claim therefore must fail.

## IV

The defendant next challenges the trial court's denial of his motion to suppress the gun that was found near him at the time of his arrest. Specifically, he claims that: (1) the trial court improperly ruled that he had no standing to challenge the search; (2) the entry by the police was unlawful because they lacked probable cause to believe that the defendant was in the apartment; and (3) the police action that led to the discovery of the gun, namely, moving the couch, exceeded the permissible scope of a search under *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

The trial court found the following relevant facts. After arriving at the apartment building identified by Riddick as the one into which the defendant had gone, Santos and Padgett knocked on the door of apartment 106. Padgett identified herself to a male dressed in a housing authority uniform. In response to Padgett's

inquiry as to the defendant's whereabouts, the man stated that only he and some children for whom he was babysitting were in the apartment. As the officers were about to leave, they received a radio message from Whalen, who was at the rear of the building, about a person attempting to leave the apartment through a window. Padgett and Santos immediately entered the apartment "to look for the suspect [and] fearing for the safety of the occupants and their fellow officers."

Once inside the apartment, the two officers observed female adults and a number of small children, all of whom Padgett ordered into the living room. Proceeding through the apartment with her gun drawn, Padgett searched for the defendant and finally found him in a bedroom crouched behind a door. This bedroom was the same one from which Whalen had observed a man trying to flee.

The defendant was subjected to a patdown search and identified himself as "Vincent Green," denying that he was Leonard Gant. The trial court found that "[o]fficer Santos observed that the defendant fit the description of Leonard Gant given by Crystle Riddick but was not dressed as she described. However, a black cap, dark gray jeans and a coat having black leather patches on it were lying on the couch, which was the only piece of furniture in the small room. Officer Santos noted that the clothing on the couch did fit the description of the clothing worn by the defendant during [Riddick's and the defendant's] confrontation."

Thereafter, Whalen joined the group inside the apartment and radioed the detective bureau for a photo of Leonard Gant. The defendant appeared nervous and was pacing about the room. Santos then moved the couch "a few inches from the wall" and discovered the gun beneath the couch. After a brief struggle, the defendant was arrested on the threatening charge.

Other police brought the requested photo to the scene and the defendant's identity as Leonard Gant was confirmed.

We first address the defendant's argument that the trial court improperly concluded that he did not have standing to challenge the search conducted in a friend's apartment. Because we conclude that the search and seizure here were constitutionally permissible, we need not decide whether the trial court was correct and we will assume that the defendant has standing for the purpose of the disposition of this issue.[14]

We next turn to the defendant's claim that the trial court should have granted his motion to suppress the gun because the police did not have probable cause to believe that he was in the apartment. He argues that because the police had no basis for relying on Riddick's unsubstantiated suggestion that the defendant could be located in apartment 106, entry into the apartment was not justified. We find this argument to have no merit.

We first reject the assertion that the police proceeded to apartment 106 and entered thereafter on the unsubstantiated word of Riddick. Both the circumstances of Riddick's complaint and Riddick's own personal situation militate against the defendant's argument. To accept the defendant's contention would belittle the sound investigative work undertaken by the police in this case. The police were aware of the following information: (1) the active felony murder warrant for the defendant, which charged the defendant's use of a weapon to commit a homicide; (2) a complaint from Rid-

---

[14] We note that, while the trial court disposed of the motion to suppress on the standing issue, it nonetheless found that the police had probable cause to enter the apartment initially and arrest the defendant and that, for reasons of safety, the search for the gun within the unrestrained defendant's "wing span" was justified.

dick alleging that a person, whom she identified as the defendant, had just threatened her with a gun; (3) Riddick's lifelong acquaintance with the defendant; and (4) Riddick's residency in and familiarity with the apartment complex into which the defendant had reportedly entered.

"Probable cause means more than mere suspicion. There must be facts and circumstances within the officer's knowledge, and of which he has trustworthy information, sufficient to justify the belief of a reasonable person that an offense has been or is being committed." (Internal quotation marks omitted.) *State* v. *Velez,* 215 Conn. 667, 672, 577 A.2d 1043 (1990). "[T]he existence of probable cause is to be determined on the basis of the collective information of the law enforcement organization as a whole and not solely on that of the arresting officer." *State* v. *Cobuzzi,* 161 Conn. 371, 377, 288 A.2d 439 (1971), cert. denied, 404 U.S. 1017, 92 S. Ct. 677, 30 L. Ed. 2d 664 (1972); *State* v. *Wilson,* 153 Conn. 39, 42, 212 A.2d 75 (1965).

Certainly, in the context of a probable cause determination, the police had probable cause to proceed to apartment 106 to inquire whether the defendant was within and to arrest him if they found him. The essence of the defendant's challenge to the seized evidence, however, involves the actions of the police thereafter.

It is a fundamental principle of search and seizure law that, in the absence of exigent circumstances and probable cause for arrest, a person's house may not be entered without a warrant, and that warrantless searches and seizures inside a house are presumptively unreasonable. *Payton* v. *New York,* 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State* v. *Guertin,* 190 Conn. 440, 446, 461 A.2d 963 (1983).[15] The

---

[15] In this respect, article first, § 7, of the Connecticut constitution mirrors the federal constitution's fourth amendment protection against unreasonable search and seizure.

term, "exigent circumstances," does not lend itself to a precise definition but generally refers to " 'those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization.' *United States* v. *Campbell,* 581 F.2d 22, 25 (2d Cir. 1978)." *State* v. *Guertin,* supra, 447.

Here, Padgett and Santos were about to leave the apartment after having been informed that the defendant was not within, when they were notified by other police officers situated in the rear of the building that a person had attempted to flee through the rear window of that same apartment and, upon seeing the police, had reentered the apartment. Padgett and Santos were cognizant that the defendant was wanted for a serious and violent crime involving the use of a gun, that he was the subject of a very recent complaint in which he was reported to have been armed with a handgun, that he was reported to be located in the apartment, that a person was reported attempting to flee through a window, and that both children and adults were in that person's immediate presence. We conclude that these police officers were sufficiently faced with exigent circumstances to justify warrantless action, namely, the entry into the apartment itself. See *Edwards* v. *United States,* 619 A.2d 33 (D.C. App. 1993); see also *Boston Housing Authority* v. *Guirola,* 410 Mass. 820, 575 N.E.2d 1100 (1991).

Once inside the apartment, the police were soon confronted with an individual, initially unknown to them, who was hiding in the room from which a person had been seen attempting to exit. After patting down this individual and the clothing laid on the couch in the room, Santos moved the only piece of furniture, a couch, away from the wall and found a gun. While the defendant does not challenge the initial restraint and

patdown of himself or his clothing, he vigorously challenges the search and seizure of the gun as beyond the scope of a search permitted under *Terry* v. *Ohio,* supra, 392 U.S. 1. We are thus left to resolve whether, under the circumstances of this case, the seizure of the gun can be sustained.

"It is well established that the fourth amendment to the United States constitution allows a police officer to detain an individual briefly for investigative purposes if the officer has a 'reasonable and articulable suspicion' that the individual is engaged in criminal activity. *Alabama* v. *White,* 496 U.S. 325, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990); *Terry* v. *Ohio,* [supra, 392 U.S. 1]; *State* v. *Mitchell,* 204 Conn. 187, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987)." *State* v. *Cofield,* 220 Conn. 38, 44–45, 595 A.2d 1349 (1991).[16]

"Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion." *State* v. *Torres,* 230 Conn. 372, 379, 645 A.2d 529 (1994), citing *State* v. *Januszewski,* 182 Conn. 142, 148–49, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). "The police officer's decision . . . must be based on more than a hunch or speculation." *State* v. *Cofield,* supra, 220 Conn. 45. "In justifying the particular intrusion 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' *Terry* v. *Ohio,* supra, [392 U.S.] 21." *State* v. *Januszewski,* supra, 148–49.

[16] We held in *State* v. *Lamme,* 216 Conn. 172, 184, 579 A.2d 484 (1990), that, with respect to article first, § 9, of the Connecticut constitution, we will follow the law regarding prearrest detentions as established in *Terry* v. *Ohio,* supra, 392 U.S. 1, and its progeny.

While he concedes that the initial *Terry* detention and patdown were permissible, the defendant maintains that the warrantless search for the gun, by moving the couch, exceeded the scope of a *Terry* detention since he had yet to be formally arrested. The state argues that the search was incident to a lawful arrest in light of the fact that there was an outstanding warrant for the defendant's arrest for felony murder that was known to all the officers present at the apartment building. We conclude that the question regarding the search for and seizure of the gun is resolved by principles relied on by neither party.

First, we are persuaded from our review of the record that the defendant's arrest did not occur until *after* the gun had been discovered. The trial court found this to be so and the testimony of the arresting officers reveals that they did not immediately arrest the defendant upon finding him in the room because they were unsure as to his real identity. On the basis of this record, then, the search for the gun cannot be justified as incident to a prior lawful arrest.[17] While we are reluctant to undertake any broad extension of the scope of a search incident to a *Terry* detention to include the discovery of the gun, we nonetheless conclude that the police permissibly recovered the gun pursuant to the doctrine of "exigent circumstances." We further conclude that the circumstances of the *Terry* detention

---

[17] We note that there is precedent for the proposition that a formal arrest need not always chronologically precede the search when there is probable cause to arrest as long as the arrest and search and seizure are substantially contemporaneous and are integral parts of the same incident. See *Rawlings* v. *Kentucky,* 448 U.S. 98, 111, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980); see also *State* v. *Federici,* 179 Conn. 46, 54–55, 425 A.2d 916 (1979). While the sole observation of the defendant's discarded clothing suggests that the police might have had probable cause to arrest the defendant on the threatening complaint, we find this to be insufficient to justify the search and seizure here, especially given the fact that the police initially could not establish the defendant's true identity.

evolved into a situation in which the police properly engaged in a limited search for a dangerous weapon during the period of exigency.

In *State* v. *Januszewski,* supra, 182 Conn. 152, this court observed that a search warrant would not be required "where exigent circumstances exist that make the procurement of a search warrant unreasonable in light of the dangers involved . . . ." Professor Wayne LaFave has commented that exigent circumstances may exist where "there may be no risk of removal [of the evidence] whatsoever, but it may be thought that, if the police delay while a warrant is obtained, the object may cause or be used to cause harm within . . . ." 2 W. LaFave, Search and Seizure (2d Ed. 1987) § 6.5 (d), p. 683. Generally, the immediate warrantless search for weapons is thought of in the context of protection of the investigating or arresting law enforcement official. Courts, however, have also noted that "[e]xigent circumstances also include fear for the safety of bystanders. *United States* v. *Spinelli,* 848 F.2d 26, 28 (2d Cir. 1988)." *United States* v. *Turner,* 926 F.2d 883, 886 (9th Cir. 1991). This court, however, has never countenanced a warrantless search based on the necessity of exigent circumstances.

Against these principles, our review of the present record leads us to conclude that there were exigent circumstances that justified the search for the gun. It is significant to our determination that: (1) the defendant was unrestrained and walking freely about the room; (2) he appeared nervous and anxious; (3) the room itself was quite small; (4) there was only one piece of furniture, the couch, in the room; (5) the trial court concluded that, given his mobility, the gun was within the defendant's reach; (6) the defendant was wanted for a violent crime in which a handgun had been used; (7) he had just very recently threatened a citizen with a

handgun before entering the apartment; (8) the search was a very limited one; and (9) innocent adults and children were inside the apartment where the detention was taking place.

Although we have held that "[w]hen there are reasonable alternatives to a warrantless search, the state has not satisfied its burden of proving exigent circumstances"; *State* v. *Guertin,* supra, 190 Conn. 449, citing *State* v. *Krause,* 163 Conn. 76, 81, 301 A.2d 234 (1972); we also have previously noted that, while we respect the constitutional rights against unreasonable search and seizure of the citizenry, " '[c]ertainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.' *Terry* v. *Ohio,* supra, [392 U.S.] 23." *State* v. *Dukes,* 209 Conn. 98, 122, 547 A.2d 10 (1988). The facts of this case, as expressly found by the trial court, lead inexorably to the conclusion that the police were faced with a situation of imminent danger had the gun not been immediately located. Armed with reasonable and articulable suspicion that the man in the room was the defendant, a dangerous person from the police perspective, but uncertain as to his exact identity at that moment, Santos, by moving the couch, properly neutralized the only logical area from which harm might come.

We also find it of great significance that small children were located within the apartment throughout the period of the defendant's detention and arrest. In discussing the question of exigent circumstances and warrantless searches for dangerous instruments, Professor LaFave comments, "it is not enough that the object of the search is the type of thing which could be used to cause death or serious harm; rather, there must be a belief that such might occur if seizure were delayed." 2 W. LaFave, supra, p. 684. The combination of guns and children can be fatal. The specter of a spontane-

ous shootout between the defendant, had he reached the gun first, and the police in an apartment populated by innocent adults and children, justified the police action in this case.

We conclude that, under the circumstances of this record, faced with exigent circumstances, the police properly conducted a warrantless search of the area from which the defendant might have gained possession of the gun that imminently could have caused harm to themselves and others within the apartment.

## V

The defendant's next claim is that the trial court improperly admitted evidence of the prior in-court identification of the defendant at the probable cause hearing that had taken place, which he claims was tainted by impermissibly suggestive police procedures in violation of his right to due process under the fourteenth amendment to the constitution of the United States. He argues that both the photographic array viewed by eyewitness McKinnon and her in-court identification of the defendant at the probable cause hearing itself were unnecessarily suggestive and that, as a result, the in-court identification at trial was tainted and unreliable and must be disallowed. We disagree.

A brief review of the following facts is relevant to the disposition of this claim. On March 14, 1990, three days after the shooting, McKinnon viewed a photographic array at the Bridgeport police department. The police had constructed the array after Levi Mason had given them a statement implicating the defendant in the crime. At trial, McKinnon testified that the police had not drawn her attention to any photograph. After viewing the six photographs, McKinnon was unable to make a positive identification but selected two photographs as possibilities; one of these was that of the defendant. On May 17, 1990, at the probable cause

hearing, McKinnon testified that, prior to the hearing, James Giammattei, an investigator for the state's division of criminal justice, and Robert Lacobelle, assistant state's attorney, told her only that "[t]hey (the police) had somebody." Later, at trial, she further testified that no one had told her that the defendant was going to be in the courtroom during the probable cause hearing. Upon viewing the defendant at the hearing, McKinnon said that she was "[v]ery close to a 100 percent" sure about her identification of him. The defendant did not challenge this in-court identification at that time. At trial, over the defendant's objection, McKinnon again identified the defendant as Lagnese's assailant, testifying that she had no doubt as to her certainty.[18]

"In determining whether a pretrial identification procedure violated a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980)." (Internal quotation marks omitted.) *State* v. *Tatum,* supra, 219 Conn. 727. We conclude that the challenged procedure was not unnecessarily suggestive and thus we need not reach the question of the identification's independent reliability.[19]

---

[18] The defense counsel's objection, perhaps inartfully but clearly enough, contemplated the challenge to the alleged suggestive identification at the probable cause hearing that he presses on appeal: "My objection is to the in-court identification based upon what we feel is the probable cause identification by this young lady [McKinnon] and that being the basis for [identifying] Mr. Gant as the perpetrator."

[19] In disposing of this claim we note from the record that the defendant never challenged the composition of the photo array itself before the trial

The defendant argues that the one-on-one show up that is inherent in McKinnon's identification of him sitting at the defense table during the probable cause hearing was unnecessarily suggestive and deprived him of his right to due process. In *State* v. *Tatum,* supra, 219 Conn. 731, we held that the routine, albeit suggestive, confrontation that occurs between a witness and a defendant at the probable cause hearing is " 'necessary' and entirely permissible." We held that this is so especially when a defendant does not avail himself of allowable procedures such as a request to be seated among courtroom spectators or a motion for a lineup prior to the hearing that would have lessened the suggestiveness of the confrontation. Id., 728.[20]

We conclude that *Tatum* disposes of the defendant's claim here. We find nothing in this record that persuades us that the in-court identification procedure employed at the defendant's probable cause hearing was less than routine. He fully exercised the power of

court. Indeed, the defendant himself introduced the photo array into evidence at trial purportedly because the array worked in his favor in that McKinnon did not make a positive identification from the photo array alone.

The defendant claims on appeal that the array was unnecessarily suggestive because the two photos selected by McKinnon were "highlighted." Because there is no record of a challenge to the photo array before the trial court, we, not being a fact finding, but a reviewing court, cannot pass on the matter as it applies to the alleged suggestiveness of the photo array. The defendant has an obligation to provide this court with a record adequate to review his claims. *State* v. *Crumpton,* 202 Conn. 224, 231, 520 A.2d 226 (1987). Thus, even if we were to find that this out-of-court procedure was unnecessarily suggestive we are faced with the same quandary that this court noted in *State* v. *Tatum,* supra, 219 Conn. 727 n.11, in which we similarly found the record to be insufficient to review the reliability prong.

[20] In *State* v. *Tatum,* supra, 219 Conn. 729, we recognized that, because the state has no constitutional duty to conduct and the defendant has no constitutional right to a lineup, the fact that the police did not take steps to lessen the suggestiveness inherent in the probable cause identification procedure "does not render the routine procedure that was used unnecessary or impermissible."

cross-examination to test McKinnon's identification both at the pretrial hearing and the trial itself. We discern from the record no egregious conduct whatsoever on the part of the prosecution that affected or tainted McKinnon's in-court identification of the defendant, and, accordingly, we do not find that the identification was the product of impermissible suggestiveness.

## VI

The defendant's final claim involves an allegedly improper prosecutorial comment made during the state's closing argument. During that argument the prosecutor apparently made a comment alluding to the Somers correctional facility as "where the defendant might end up." The trial court sustained the defendant's objection to the remark and admonished the prosecutor.[21] After the trial court's instructions to the jury, the defendant moved for a mistrial on the ground that the improper prosecutorial comment denied him a fair trial. The trial court denied the motion. The relevant colloquy between the defendant's counsel and the court proceeded as follows:

"Mr. Holden: Your Honor, just prior to, as Your Honor was giving the charge, I was thinking about the argument the State made regarding the Somers issue. I believe that's improper argument, Your Honor. I believe that argument, given the way the State delivered the argument, has hereby deprived my client of a fair trial and I would ask the court to grant a mistrial in that instance."

"The Court: I don't think any way, manner shape or form that requires a mistrial and I have told the jury

---

[21] By agreement of the parties the court reporter was excused from recording the closing arguments. The only colloquy regarding the initial objection to this remark appears in the transcript as follows:

"Mr. Holden: That's objectionable.

"The Court: Sustained. There should have been no comment made by you as to where the defendant might end up in any event."

or indicated it was not a fair comment to the jury and advised the jury that that should not enter into their thinking. So your exception is noted."

The disposition of this claim requires little discussion. Neither the defendant nor the state requested that closing arguments be recorded, and, accordingly, no transcript reflects the full text or context of the challenged prosecutorial remark.[22] The defendant filed a motion for the rectification of the record seeking to reconstruct the pertinent part of the prosecutor's argument. After conferences with the defense counsel, prosecutor and court reporter, the trial court concluded that the efforts to reconstruct had "proven fruitless." This court subsequently granted the defendant's motion for review of the trial court's denial of the motion for rectification, but denied the relief requested.

The state argues that we should summarily reject this claim because the defendant has not provided the court with an adequate record for our review. We agree.

This court has held that, if the parties do not request the formal recordation of closing arguments, the appellate record, which is the appellant's responsibility to provide, is insufficient for us to undertake a proper review of the claims on appeal. *Bieluch* v. *Bieluch,* 199 Conn. 550, 552, 509 A.2d 8 (1986); *Grunschlag* v. *Ethel Walker School, Inc.,* 189 Conn. 316, 320, 455 A.2d 1332 (1983). Here, the absence of a complete transcript is directly attributable to the defendant's acquiescence

---

[22] We note that, pursuant to General Statutes § 51-61a, a court reporter has no statutory duty to record final arguments in the absence of a formal request. That statute provides in relevant part: "COURT REPORT TO BE SWORN. DUTIES. TRANSCRIPT. (a) Each official court reporter, before entering upon the duties of his office, shall be sworn to faithfully perform them and shall then be an officer of the court. He shall attend the court and make accurate records of all the proceedings in the court, except arguments of counsel, provided upon the request of any party, he shall make accurate records of the arguments of counsel."

in the release of the court reporter from recording the closing arguments. "We have frequently refused to consider claims of improper argument where the remarks of counsel have not been transcribed and could not be reconstructed." *State* v. *Vitale,* 190 Conn. 219, 226, 460 A.2d 961 (1983). We conclude that the same result must apply in this case.

The judgment is affirmed.

In this opinion PETERS, C. J., and PALMER, J., concurred.

BERDON, J., with whom KATZ, J., joins, dissenting. I am troubled by the majority opinion. On appeal, the state raises for the first time the claim that there existed exigent circumstances to justify the search of the room where the defendant, Leonard Gant, was being detained. The trial court refused to suppress the evidence of the gun, not on the ground of exigent circumstances, but on the basis that the defendant did not have standing to contest the search, and, in the alternative, it was a valid search incident to a lawful arrest.

I recognize that exigent circumstances may justify the warrantless entry into a home and a search of the premises. See *State* v. *Geisler,* 222 Conn. 672, 690–92, 610 A.2d 1225 (1992). Such intrusive conduct, however, is limited to " 'situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly . . . .' " *State* v. *Guertin,* 190 Conn. 440, 447, 461 A.2d 963 (1983). "The United States Supreme Court has upheld such entry where it appears that there was a *compelling need* for official action and no time to secure a warrant. *Michigan* v. *Tyler,* 436 U.S. 499, 509, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978) (warrantless entry of burning commercial building); *Warden* v. *Hayden,* [387 U.S. 294, 301, 87

S. Ct. 1642, 18 L. Ed. 2d 782 (1967)] (warrantless entry of home in hot pursuit of armed robber); *Ker* v. *California,* 374 U.S. 23, 83 S. Ct. 1623, 10 L. Ed. 2d 726 (1963) (warrantless and unannounced entry of dwelling to prevent imminent destruction of evidence)." (Emphasis added.) *State* v. *Guertin,* supra, 448. Furthermore, "unnecessary police-created exigencies are not legitimate exceptions to the warrant requirement." Id., 453. "The three general categories which the [United States Supreme Court] has identified as emergency situations are those involving (1) danger to human life; (2) destruction of evidence and (3) flight of a suspect." Id., 448. In the present case, the only basis for the warrantless search under exigent circumstances was danger to human life.

"[G]iven the rationale for this very limited exception, the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat. *Good* v. *Dauphin County Social Services,* 891 F.2d 1087, 1094 (3d Cir. 1989). The police, in order to avail themselves of this exception, must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . . *People* v. *Mitchell,* 39 N.Y.2d 173, 178, 347 N.E.2d 607, 383 N.Y.S.2d 246, cert. denied, 426 U.S. 953, 96 S. Ct. 3178, 49 L. Ed. 2d 1191 (1976). It is an objective and not a subjective test. The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed. *State* v. *Klauss,* 19 Conn. App. 296, 302, 562 A.2d 558 (1989); see *State* v. *Guertin,* [supra, 190 Conn. 453] (adopting objective test for warrantless felony arrest exigency analysis); see also *United States* v. *Zabare,* 871 F.2d 282, 291 [(2d Cir.), cert. denied, 493 U.S. 856, 110 S. Ct. 161, 107 L. Ed. 2d 119 (1989)] (test

for determining whether a warrantless entry was justified by exigent circumstances is an objective one).'' (Internal quotation marks omitted.) *State* v. *Geisler,* supra, 222 Conn. 691–92.

Furthermore, we have noted that " '[w]hen there are reasonable alternatives to a warrantless search, the state has not satisfied its burden of proving exigent circumstances.' " *State* v. *Guertin,* supra, 190 Conn. 449, quoting *State* v. *Schonagel,* 189 Conn. 752, 763, 459 A.2d 106 (1983), vacated and remanded for further consideration, 465 U.S. 1002, 104 S. Ct. 990, 79 L. Ed. 2d 224, appeal withdrawn on remand, 192 Conn. 652, 473 A.2d 300 (1984). Otherwise, the exigent circumstances exception would be so open-ended as to make the warrant requirement meaningless.

Although we make a de novo review of whether the emergency doctrine is applicable, we base that determination upon "the subordinate facts found by the trial court . . . ." *State* v. *Geisler,* supra, 222 Conn. 693–94; *State* v. *Joyce,* 229 Conn. 10, 27 n.10, 639 A.2d 1007 (1994); *State* v. *Schonagel,* supra, 189 Conn. 762. The trial court in this case did not make any factual finding that would support the conclusion that an emergency existed. Therefore, I would remand this matter to the trial court so that it could hold a hearing and determine whether exigent circumstances justified the warrantless search by the police. See *State* v. *Ellis,* 227 Conn. 902, 902–903, 630 A.2d 73 (1993); *State* v. *Patterson,* 227 Conn. 448, 455, 629 A.2d 1133 (1993); *State* v. *Cobbs,* 198 Conn. 638, 643–44, 504 A.2d 513 (1986).

Accordingly, at this time, I would not reach the remaining issues. I respectfully dissent.