[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a Motion to Suppress in which the above cited defendant alleges that a search of his person and vehicle, and subsequent seizure of items of contraband therefrom, violated his rights under the Constitutions of the United States and the State of Connecticut. After considering the evidence produced at a hearing on the motion and weighing and assessing the credibility of the witnesses who testified at said hearing, the court finds the following facts to have been proven.
Sgt. Milton Hardy is a twelve-year veteran of the Vernon Police Department. He is a graduate of the FBI National Academy; he has specialized training in narcotics investigations; and he worked for more than one year as an undercover police officer with the Tri-State Regional Narcotics Squad. Hardy also participated in numerous narcotics and controlled substance cases and he has considerable experience and training in that field.
On Sunday, February 6, 2000, at approximately 10:20 p.m., Hardy was driving a marked police vehicle on Center Road in Vernon on his way to the Vernon Police Station when he observed a red Pontiac Fiero automobile eastbound on Route 30 at a high rate of speed. Hardy estimated the speed of the vehicle to be 50 to 55 mph in a posted 35 mph zone. He further observed the vehicle to cross over the marked center line of the highway CT Page 13016 before turning left onto West Street.
Hardy followed the Pontiac onto West Street at a speed of 60 to 70 mph. However, the Pontiac remained ahead of his vehicle and he estimated its speed at that time to be approximately 70 to 75 mph in a 45-mph zone. The Pontiac was forced to slow down behind another vehicle in his lane of travel and the Pontiac stopped when the vehicle in front stopped for a traffic light. After the light changed the Pontiac proceeded through the intersection at which time Hardy activated his lights and siren in an effort to cause the vehicle to stop for the purpose of issuing the operator a citation for speeding. The vehicle continued for approximately three tenths of a mile before finally stopping on Spring Street. Hardy made an in court identification of the defendant, Aaron Kaloustain, as the operator of the Pontiac.
After stopping the vehicle, described as a small two-door, two seat, sports type automobile, Hardy approached the rear portion of the driver's door and shined his flashlight into the Pontiac and onto the driver who was the only occupant. For his own protection, and following standard police procedure, Hardy did not move forward of the car door handle. Hardy asked the operator for his license, registration and insurance card which were provided to him. Hardy saw nothing suspicious in the interior of the vehicle at that time, although he did notice that the operator seemed to be very nervous. His hands were shaking and he told Hardy that he had just come from Pennsylvania and was in a hurry to get to his sister's house.
Officer Alexander, who was nearby on routine patrol, heard Hardy notify the police dispatcher that he was stopping a vehicle. She decided to go to the scene to backup Hardy. Officer Dombek was also nearby and he too responded as a backup officer. They both arrived about the time Hardy was returning to his police vehicle to call the police dispatcher with the license and registration information. The information came back identifying the operator as Aaron Kaloustain. His operator's license was valid, there were no outstanding warrants for the individual, and there were no reports of any criminal activity in the area that could be associated with the operator. Hardy was also told by the dispatcher that Kaloustain was on parole from Pennsylvania for a conviction of Armed Robbery with a baseball bat.
As Hardy was writing an infraction for a violation of § 14-218
(infraction speeding), both Alexander and Dombek observed Kaloustain, who was sitting in the driver's seat of the Fiero, reaching down in the area of the driver's floorboard. One of the backup officers brought this observation to Hardy's attention, as well as the fact that Kaloustain appeared to be banging his head against the steering wheel of his car. CT Page 13017 Hardy also observed that Kaloustain was rapidly smoking cigarettes and putting on a jacket while waiting in the car.
Kaloustain, who testified that he was very nervous after being stopped by Hardy, denied hitting his head against the steering wheel. His explanation for his observed behavior was that he was playing his stereo and was "bopping" or moving to the music. The court does not accept the defendant's explanation of his movements as credible. Someone who is as nervous as the defendant said he was during this traffic stop is unlikely to behave in the relaxed manner that the defendant would have the court believe.
The physical reactions and behavior of the operator, coupled with the newly acquired knowledge that the operator was on parole for armed robbery, made Hardy more cautious and suspicious. However, Hardy testified that he did not have articulable, justifiable reason to detain Kaloustain, nor did he believe that he had probable cause to search Kaloustain or the vehicle.
After filling out the infraction summons, Hardy again approached the driver's door of the Pontiac in order to give the summons to the driver. Once again he remained in the area of the door handle of the car for his own safety, and again shined his flashlight into the car. This time Officer Alexander approached the passenger side of the vehicle. The driver's window was down and Hardy explained and handed the summons to Kaloustain and told him that he was "all set," meaning that he was free to go. Kaloustain replied "okay." Hardy testified that at that time Kaloustain was free to go.
However, before Kaloustain could leave Hardy asked him why he was on parole and whether he had any weapons or drugs in the car. At that point Kaloustain broke eye contact with Hardy, looked down and then looked back at Hardy and said, "no." Hardy testified that this was known as a "targeting glance" where a suspect targets the location of drugs or weapons being discussed by quickly looking in the direction of the items to make sure the item cannot be seen. Hardy then asked Kaloustain whether he could search the car. Kaloustain said that he could but when Hardy asked him to step out of the car he asked why. When told that Hardy wanted to pat him down for weapons before searching the car Kaloustain declined to exit the car and effectively withdrew his consent for the search saying that he had not done anything wrong.
The evidence is clear that at the time the infraction summons was issued Hardy did not have reasonably articulable facts upon which to conclude that Kaloustain had committed or was in the process of committing a crime. He had a hunch that Kaloustain had contraband in the CT Page 13018 car but absolutely no facts to support that hunch and no probable cause to search the defendant or the car. (Tr. 1, p. 58) "Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . The police officer's decision . . . must be based on more than a hunch or speculation. . . . In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Citations omitted; internal quotation marks omitted.) State v. Gant,231 Conn. 43, 65, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038,115 S.Ct. 1404, 131 L.Ed.2d 291 (1995).
Hardy admitted that every question he asked of the defendant was answered with information that corresponded with what Hardy knew or determined to be correct. Although Hardy did not believe the defendant when he said that there were no drugs in the car, that belief was based upon a hunch, not articulable suspicion. Additionally, there were no outstanding warrants for Kaloustain, no crimes had been reported in the area, and there was no indicia of the presence of marijuana or any other contraband in the car. None of the three police officers on the scene saw anything which they considered threatening or which they would constitute as probable cause to arrest the driver or search the car. Considering the testimony of the officers that it was a very cold night, the fact that the driver put on a jacket is innocuous. The driver appeared to be very nervous but Sargent Hardy testified that he too is very nervous when being stopped by a police officer. (Tr. 1, p. 43) Moving around in the car and reaching to the floor are not per se indicia of illegal behavior, especially given the length of time the defendant waited in the car. Given the totality of these facts and circumstances, the court finds that Sargent Hardy's conclusion that he did not have sufficient articulable suspicion to justify a search of the vehicle was correct.
After issuing the summons, Hardy then asked Kaloustain whether it was a violation of parole to leave the state without the permission of his parole officer. Kaloustain stated that he had done so before "so it should be okay." (Tr. 1, P. 17) Hardy then asked the name of his parole officer, to which Kaloustain responded, "John Gasiorek, go ahead and give him a call." (Tr. 1. P. 17) Hardy did just that.
The court finds that from that point on Kaloustain was no longer free to leave. See: State v. Ostroski, 186 Conn. 287, 291-292 (1982); Statev. Oquendo, 223 Conn. 635, 346-647 (1992). Kaloustain was in the presence of three uniformed police officers, at least one of whom was standing to the right rear of his car at all times, including while Hardy was CT Page 13019 attempting to contact the parole officer on his cellular phone. Under those circumstances, any reasonable person would believe that he was not free to leave. Hardy's testimony concerning this issue was vague and somewhat unresponsive, but it is clear to the court that Kaloustain would not be permitted to leave the area until Hardy determined whether the parole officer would authorize a search of the defendant's car. (Tr. 1, p. 94-97).
Hardy called the police dispatcher and had a telephone call to the parole officer Gasiorek patched through to Hardy's cellular phone. Hardy explained to the parole officer that he had stopped Kaloustain for speeding and that he suspected that there was contraband in the car but that he did not have probable cause to search the car and Kaloustain would not give his consent to a search. He asked the parole officer if there was any way that he could authorize a search of the car. Gasiorek said that he did not think so but that Hardy could tell Kaloustain that if he did not consent to the search his parole officer would put a parole hold on him. Hardy rejected this suggestion. He correctly concluded that the court would not consider a search under such coercion to be consensual. When the parole officer stated that it would be difficult to violate Kaloustain's parole, Hardy told the parole officer that he was not interested in violating the suspect's parole either. (Tr. 2, p. 66) Gasiorek then asked Hardy to tell Kaloustain to meet him in his office in the morning. Hardy then asked the parole officer to remain on the phone saying, "I'll see what I can do."
Based upon the evidence presented and the totality of the circumstances, the court is persuaded that the reason Hardy continued to detain Kaloustain and the reason he contacted the defendant's parole officer had little to do with arresting Kaloustain for violation of parole and everything to do with searching the car.
Hardy returned to the Fiero for the third time to tell Kaloustain that his parole officer wanted to see him in his office in the morning. However, this time he decided to vary his approach to the car in order to break the pattern he had established of standing next to the door handle. Instead, Hardy stood next to the front portion of the driver's door. Hardy testified that he spoke with Kaloustain through the driver's window and shined his flashlight downward illuminating the floorboard where Kaloustain was sitting. Hardy further testified that he observed a portion of a plastic baggie sticking out about an inch to an inch and a half from under the driver's seat and that he was able to observe that the baggie contained a green leafy type of material which he believed was marijuana.
Hardy told Kaloustain to get out of the car and to walk to the rear of CT Page 13020 the car, which he did. Hardy then conducted a pat down of Kaloustain's clothing, for his own safety. During the pat down Hardy felt a hard object in Kaloustain's pants pocket. He asked Kaloustain what the object was but Kaloustain refused to answer. Hardy then reached into the pocket and removed a pouch which he opened and discovered what he believed to be marijuana, a lighter, and a small pipe. Hardy then returned to the Fiero, looked under the driver's seat and pulled a plastic baggie containing what was later confirmed to be marijuana out from under the seat. A subsequent search of the vehicle revealed additional contraband which was seized by the police. The pouch and plastic bags containing marijuana were not offered in evidence during the hearing.
The court observed that the vehicle has a very compact driver's compartment with very little leg room for the driver. On that particular day the glare from the sun made it difficult to see into the car through the windows, but when shading the view from the sun the observer was unable to see very much of the floorboard while standing outside the car and looking through both the front windshield and the driver side window. The court also found that the opening under the front of the driver's seat while very narrow was nevertheless significantly larger than the opening under the rear of the seat. While it would have been difficult to put the baggie of marijuana under the seat from the area of the front floorboard, it would have been much more difficult, if not impossible, to accomplish that task from the rear of the seat. The defendant's testimony that he placed the baggie under the seat from the rear is simply not credible.
Based upon its observation of the passenger compartment of the car, the court finds that it is highly unlikely that Hardy could have seen that portion of the floor board located at the base of the driver's seat from where he was standing, especially while Kaloustain was sitting in the driver's seat of the vehicle. The court finds Hardy's testimony that he saw a portion of a plastic baggie containing a green plant like material sticking out from under the front seat not credible.
The court also finds it difficult to accept Hardy's repeated testimony that he was in fear for his own safety during the motor vehicle stop. Hardy's assertion that he thought Kaloustain might have a gun because he was on parole for the crime of armed robbery is unpersuasive.
Hardy knew that the weapon utilized in that incident was a baseball bat, not a firearm. Furthermore, Hardy never communicated to either backup officer any concerns for his or their safety, nor did he communicate to the other officers his suspicion that there was contraband in the vehicle. When he ordered the operator out of the vehicle he did so in a very routine manner, without even notifying the other officers what CT Page 13021 he was doing or why, and simply permitted the defendant to exit the vehicle in a normal manner and walk to the rear of the vehicle before patting him down. None of these actions would lead a reasonable person to believe that Hardy was fearful for his safety or that of his fellow officers.
"Under the fourth amendment to the United States constitution, and under article first, § 7, and article first, § 9, of the Connecticut constitution, a police officer may briefly detain an individual for investigative purposes if the officer has a reasonable and articulable suspicion that the individual has committed or is about to commit a crime. If during the course of a lawful investigatory detention, the officer reasonably believes that the detained individual might be armed and dangerous, the officer may undertake a patdown search of the individual to discover weapons. Because a patdown search is intended to secure the safety of the investigating officer, it is strictly limited to a search for weapons. The officer cannot conduct a general exploratory search for whatever evidence of criminal activity [the officer] might find. Furthermore, a patdown search for weapons that is justified at its inception becomes constitutionally infirm if the search thereafter becomes more intrusive than necessary to protect the safety of the investigating officer." (Citations omitted; internal quotation marks omitted.) State v. Tine, 236 Conn. 216, 223-234 (1996)
"The fourth amendment to the United States constitution, made applicable to the states through the fourteenth amendment, prohibits unreasonable searches and seizures by government agents. A warrantless search and seizure is per se unreasonable, subject to a few well-defined exceptions. The state bears the burden of proving that an exception to the warrant requirement applied." (Citations omitted; internal quotation marks omitted.) State v. Szepanski, 57 Conn. App. 484, 487-488 (2000) The court finds that the State has not met that burden in this case. Specifically, the court finds that: (1) the length of time the defendant was detained after the summons was issued was excessive and not justified under the circumstances of this situation, (2) the stated purpose for the extended detention of the defendant was a pretense for bypassing a lack of probable cause to search the vehicle, and (3) the officer's testimony regarding his observation of the marijuana sticking out from under the seat was not credible under the circumstances. Accordingly, the motion to suppress is granted.
Terence A. Sullivan Superior Court Judge