STATE OF CONNECTICUT *v.* ALLEN LAMONT JAMES
(AC 30910)

Harper, Beach and Borden, Js.

Argued October 27, 2010—officially released January 25, 2011

*Robert E. Byron*, special public defender, for the appellant (defendant).

*Paul J. Narducci*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, *David J. Smith*, senior assistant state's attorney, and *Daniel Morelli*, certified legal intern, for the appellee (state).

*Opinion*

BORDEN, J. In *State* v. *Carpenter*, 214 Conn. 77, 570 A.2d 203 (1990), on appeal after remand, 220 Conn. 169, 595 A.2d 881 (1991), cert. denied, 502 U.S. 1034, 112 S.

Ct. 877, 116 L. Ed. 2d 781 (1992) (*Carpenter I*), our Supreme Court articulated what it later characterized as "familiar language regarding proof beyond a reasonable doubt"; *State* v. *Sivri*, 231 Conn. 115, 131, 646 A.2d 169 (1994); namely, "that any conclusion, reasonably to be drawn from the evidence, which is consistent with the innocence of the accused must prevail." (Internal quotation marks omitted.) *Carpenter I*, supra, 84. This language, or language similar to it, had come to be known as the "two inference" instruction. See *State* v. *Gant*, 231 Conn. 43, 646 A.2d 835 (1994) (characterizing following language as "two inference" instruction: "If the jury views the evidence in the case as reasonably permitting either of two conclusions—one of innocence, the other of guilt—the jury should of course adopt the conclusion of innocence" [internal quotation marks omitted]), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995). The sole question in this appeal[1] is whether the court must, when requested,[2] instruct the jury using this language, despite the fact that its instructions on proof beyond a reasonable doubt are otherwise proper. We answer this question in the negative and, accordingly, affirm the trial court's judgment of conviction.

The defendant, Allen Lamont James, was charged in a substitute information with murder in violation of General Statutes § 53a-54a, capital felony in violation of General Statutes § 53a-54b (8), interfering with a police officer in violation of General Statutes (Rev. to

---

[1] The defendant in his brief to this court raised another issue, namely, whether the court had improperly instructed the jury that it need not be unanimous in finding the defendant guilty of manslaughter in the first degree. He withdrew that issue in oral argument before this court, however.

[2] In the present case, although the defendant did file a request to charge, the record does not reflect that the request included the language he now presents as mandatory. Nonetheless, he preserved the issue for appeal by taking an exception to its absence after the court had instructed the jury. See *State* v. *Terwilliger*, 294 Conn. 399, 406, 984 A.2d 721 (2009).

2003) § 53a-167a, engaging police in pursuit in violation of General Statutes § 14-223 (b) and reckless driving in violation of General Statutes § 14-222 (a). After a jury trial, the jury found him guilty of the lesser included offense of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3),[3] and of interfering with an officer in violation of § 53a-167a,[4] engaging police in pursuit in violation of § 14-223[5] and reckless driving in violation of § 14-222.[6] The court rendered its judgment of conviction and sentenced the defendant to an effective term of fourteen years of incarceration followed by four years of special parole. This appeal followed.

The jury reasonably could have found the following facts. In the early morning hours of December 28, 2003, Sergeant Brett Mahoney of the Waterford police department saw a vehicle, operated by the defendant, traveling from the Interstate 395 connector onto Route 32 at

[3] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

[4] General Statutes (Rev. to 2003) § 53a-167a (a) provides: "A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer or firefighter in the performance of such peace officer's or firefighter's duties."

[5] General Statutes § 14-223 (b) provides in relevant part: "No person operating a motor vehicle, when signalled to stop by an officer in a police vehicle using an audible signal device or flashing or revolving lights, shall increase the speed of the motor vehicle in an attempt to escape or elude such police officer. . . ."

[6] General Statutes § 14-222 (a) provides in relevant part: "No person shall operate any motor vehicle upon any public highway of the state . . . recklessly, having regard to the width, traffic and use of such highway, road, school property or parking area, the intersection of streets and the weather conditions. The operation of a motor vehicle . . . at such a rate of speed as to endanger the life of any person other than the operator of such motor vehicle . . . shall constitute a violation of the provisions of this section. . . ."

approximately 100 miles per hour. After a lengthy pursuit, Mahoney found the vehicle, with the front door open, stopped on a private driveway in front of a gate. The defendant had fled into the surrounding wooded area. After Mahoney called for assistance, the defendant was apprehended as he emerged from the wooded area and was brought back to the vehicle. A subsequent search of the wooded area yielded two plastic bags and a suitcase that contained the human remains of the defendant's child, Alquan,[7] which the defendant had taken out of the vehicle and left in the wooded area.

After the defendant's arrest, and while he was in a police holding cell, he requested to speak with detectives. After being advised of his *Miranda*[8] rights, the defendant gave two distinctly different versions regarding Alquan's death.

The first version was that Alquan had a tendency to fall and hit his head, and that in the summer or fall of 2000, Alquan had fallen down and hit his head on a bed railing. The defendant took him out to a friend's car, where he turned blue, whereupon the defendant took him back to his house and laid him down, but Alquan did not wake up. When asked whether he had ever struck Alquan, the defendant admitted that he had done so but continued to insist that Alquan's death was an accident.

The second version was in response to a question by the police as to whether Alquan's death was accidental, intentional, out of frustration or spontaneous. The defendant said that it was spontaneous. He said that Alquan had not been listening to him and that he

---

[7] Alquan was the child of the defendant and Charleah White, and had been born in March, 1998. The defendant had had custody of Alquan since shortly after his birth.

[8] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

grabbed Alquan, threw him across the room and against the wall two or three times, backhanded him across the chest or face, and manhandled him on the shoulder. He then administered chest compressions and attempted mouth-to-mouth resuscitation on Alquan, who did not respond. The defendant did not seek medical attention for Alquan or call 911.

The defendant stated that after Alquan's death, he took his body in a suitcase to Santee, South Carolina, where he brought it to a vacant area, poured gasoline on it and lit it on fire. When the body did not burn, he put it into garbage bags, which he then put into a suitcase, put the suitcase into the trunk of his car, and eventually drove back to New London, where he kept the remains at his house. On several occasions, he had taken Alquan's body out for rides, which is what he was doing when he was apprehended on December 28, 2003. He stated that, while being pursued by the police, he stopped the car and brought the suitcase into the wooded area with the intent of turning himself in and later returning to retrieve the suitcase.

The next day, December 29, 2003, the defendant again asked to speak with detectives. He then gave a third version of Alquan's death. This version was that he never intended to hurt Alquan but needed help in caring for him. He stated that Alquan was not eating and that the defendant forced him to eat. When Alquan refused and spit out the food, the defendant threw him on the bed, and Alquan bounced off and hit his head on the floor. He then forcibly pushed down on Alquan's shoulders, and Alquan hit his head on the floor. When Alquan did not get up, he tried to perform mouth-to-mouth resuscitation, but Alquan did not respond. He then repeated the story of bringing Alquan's body to South Carolina, unsuccessfully trying to burn it, and returning with it to Connecticut.

Through his own testimony at trial, the defendant gave a fourth version of Alquan's death. This version was that one Sunday afternoon, as he was about to feed Alquan, Alquan collapsed in his hands. He laid Alquan down for about five minutes and then tried to resuscitate him. He did not seek medical attention or call 911. He then drove to South Carolina, where he tried to burn Alquan's body. He also stated that he stomped on the body several times because it did not burn as he had anticipated.

The state medical examiner and a forensic anthropologist examined Alquan's remains. This examination disclosed numerous fractures of various bones, including several fractures to the bones on each side of the head, fractures of the bone at the base of the skull, the lower jawbone, both collarbones, the second through the fifth ribs on the left side, and several finger bones. According to these witnesses, these injuries would have been caused by multiple blows and were inconsistent with falling from a bed or hitting one's head on a bed rail. According to the medical examiner, the cause of death was multiple blunt injuries and the manner of death was homicide.

A medical examiner who also was an independent consultant dealing with forensic issues regarding deaths of children testified for the defense. After examining Alquan's pediatric medical records, statements, police reports, photographs, the reports of the state medical examiner and the state's forensic anthropologist, and Alquan's remains, she was unable to determine the cause or manner of Alquan's death because of the condition of the bones and the postmortem decomposition and disruption of the body, including the burning, stomping and movement of the body.

The defendant claims that the court improperly omitted from its instructions on the concept of reasonable doubt a "two inference" instruction. Specifically, he

claims that, as he stated in his exception to the court's instructions; see footnote 2 of this opinion; the court was required to instruct the jury that, "under *State* v. *Carpenter*, supra, [214 Conn. 84] the law require[s] the court to instruct the jury that 'when evidence can be reasonably reconciled in two different ways, one consistent with guilt and one consistent with nonguilt, then the latter should be adopted by the jury and the defendant should be acquitted.' " Such instructional language, the defendant argues, is mandatory. We disagree.

We first note that the defendant does not challenge the court's instructions on proof beyond a reasonable doubt, other than the omission of the "two inference" language. He thus implicitly concedes, and we agree, that in all other respects the court's instructions were proper.[9]

---

[9] The specific language of the court regarding proof beyond a reasonable doubt was as follows: "The burden to prove the defendant guilty of any crime that you are asked to deliberate upon is on the state. The defendant does not have to prove his innocence. This means that the state must prove beyond a reasonable doubt each and every essential element necessary to constitute the alleged crime being considered by you. Whether the burden of proof resting upon the state is sustained depends not on the number of witnesses nor on the quantity of the testimony, but on the nature and quality of the testimony.

"The state has the burden of proving the defendant guilty beyond a reasonable doubt. Now, some of you may have served as jurors in civil cases where you were told it is necessary to prove only that a fact is more likely true than not true. In criminal cases, the state's proof must be more powerful than that. It must be beyond a reasonable doubt.

"A reasonable doubt is an honest and reasonable uncertainty in your minds about the guilt of the defendant after you have given full and impartial consideration to all of the evidence. A reasonable doubt may arise from the evidence itself or from a lack of evidence.

"Proof beyond a reasonable doubt is proof, for example, that leaves you firmly convinced of the defendant's guilt. In this world, we know very few things with absolute certainty. In criminal cases the law does not require proof that overcomes every possible doubt. Proof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational conclusion.

"If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime being considered, you must find

The defendant's claim is foreclosed by our Supreme Court's decision in *State* v. *Gant,* supra, 231 Conn. 47–50. In that case, the court specifically rejected the claim that so-called "two inference" language is mandatory in the context of a case in which the court has given "an otherwise proper instruction on the concept of reasonable doubt." Id., 48. Put another way, the court squarely held in *Gant* that a trial court is not mandated to include "two inference" language in its instructions to the jury on the concept of proof beyond a reasonable doubt so long as its instructions on that concept are otherwise proper. Id.

The defendant relies, for his claim of the mandatory nature of the "two inference" language, on certain language culled from two other Supreme Court opinions, namely, *Carpenter* v. *Commissioner of Correction,* 290 Conn. 107, 961 A.2d 403 (2009) (*Carpenter II*), and *State* v. *Sivri,* supra, 231 Conn. 234. The defendant focuses on the following language from *Carpenter II,* supra, 112 n.4: "[T]he *Carpenter* [*I*], [supra, 214 Conn. 77] principles have their primary operation as *rules of law* for the guidance of the fact finder"; (emphasis added; internal quotation marks omitted); and the following language from *Sivri*: "the jury, in sorting out the evidence and determining whether the state has proved its case beyond a reasonable doubt, *must be instructed to*, and must in fact, view the evidence in such a way that it cannot render a guilty verdict unless it is satisfied that the evidence meets the standards articulated in *Carpenter* [*I*]." (Emphasis added.) *State* v. *Sivri,* supra, 134. We are not persuaded.

We first note that the court's language in *Carpenter II* was simply part of a quotation from *Sivri* and was

him guilty. If, on the other hand, you are not firmly convinced of the defendant's guilt, you must give the defendant the benefit of the doubt and find him not guilty."

explicitly dictum because the court specifically noted that its reference to that language "plays no role in our decision in this habeas appeal . . . ." *Carpenter II*, supra, 290 Conn. 112 n.4. We therefore focus our attention on the language used by the court in *Sivri*, namely, both that the jury "must be instructed"; *State* v. *Sivri*, supra, 231 Conn. 134; in accordance with *Carpenter I* and that the *Carpenter I* principles constitute "rules of law"; (internal quotation marks omitted) *Carpenter II*, supra, 112 n.4.; for the jury's guidance. We conclude that, to the extent that this language suggests, as it might if taken literally, that giving a jury instruction containing the "two inference" language is mandatory on the trial court, such a suggestion is inconsistent with the square holding in *Gant* and that, therefore, the holding in *Gant* trumps it. In other words, under *Gant* it is not mandatory that a trial court give a "two inference" instruction, or language similar thereto, so long as the court's instructions on proof beyond a reasonable doubt are otherwise proper.

We reach this conclusion for two closely related reasons. First, as we have indicated, *Gant* is a square holding of the Supreme Court specifically rejecting the claim at issue in the present case. Second, the language in *Sivri* can best be characterized as dictum,[10] given the holding of *Gant*, which was decided on the same day as *Sivri*.[11] The issue in *Sivri* was not, as it was in *Gant*, whether the "two inference" language was mandatory on the trial court; it was, instead, whether there was

---

[10] The author of this opinion was also the author of *Sivri* when he was then a member of the Supreme Court. See *State* v. *Sivri*, supra, 231 Conn. 116.

[11] Both *Sivri* and *Gant* were decided on August 23, 1994. See *State* v. *Sivri*, supra, 231 Conn. 116; *State* v. *Gant*, supra, 231 Conn. 44. We note, further, that this court previously has been required to resolve an apparent conflict between diverging lines of Supreme Court authority. See, e.g., *Plawecki* v. *Angelo Tomasso, Inc.*, 1 Conn. App. 48, 49–52, 467 A.2d 944 (1983), cert. denied, 192 Conn. 801, 470 A.2d 1218 (1984).

sufficient evidence to sustain the defendant's conviction, and it was in the context of the discussion of that issue that the court addressed the question of whether the "two inference" language was part of the appellate function of reviewing the sufficiency of evidence. Simply put, we conclude that, in using the language on which the defendant in the present case relies, the court in *Sivri* did not intend to undermine its concurrent holding in *Gant*.

The judgment is affirmed.

In this opinion the other judges concurred.