******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* CHRISTOPHER BROWN
(AC 35508)

Lavine, Sheldon and Bishop, Js.

*Argued January 23—officially released October 14, 2014*

(Appeal from Superior Court, judicial district of Tolland, geographical area number nineteen, Mullarkey, J.)

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Nicole I. Christie*, assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Christopher Brown, appeals from the judgment of conviction rendered against him after a jury trial on charges of conspiracy to commit burglary in the third degree in violation of General Statutes §§ 53a-48 and 53a-103, accessory to burglary in the third degree in violation of General Statutes §§ 53a-8 and 53a-103, conspiracy to commit larceny in the third degree in violation of General Statutes §§ 53a-48 and 53a-124, and accessory to larceny in the third degree in violation of General Statutes §§ 53a-8 and 53a-124. On appeal, the defendant claims that (1) the trial court erred in allowing the state to introduce evidence of his prior misconduct to prove his intent and motive to commit the charged offenses; (2) his conviction of certain charges violated his constitutional right against double jeopardy; and (3) the trial court's jury instructions on the essential elements of conspiracy were erroneous. We affirm the judgment of the trial court.

The following procedural history and evidence adduced at trial are relevant to our resolution of this appeal. In January, 2010, Gerald Hargrave and his wife, Carrie Hargrave, resided in a single-family home located at 6 Longview Street in Ellington. On January 10, 2010, Carrie Hargrave died. Shortly thereafter, Gerald Hargrave[1] was admitted to a hospital as a result of a prescription drug overdose, for which he was still in the hospital on February 4, 2010, the date at issue, until he was discharged sometime later in February, 2010. While Hargrave was in the hospital, he gave his mother and brother the keys to his home so that they could clean and prepare it for his return from the hospital. As a part of their work in this regard, Hargrave's mother and brother intentionally removed all prescription drugs from the premises.

When Hargrave's mother visited the home on February 3, 2010, she did not notice anything out of order. All of the doors and windows were closed and locked when she left the premises that day. When she returned to the home on the next day, however, she noticed that several of her son's possessions had disappeared. The missing items included Hargrave's desktop computer, monitor and several related computer accessories, his surround sound system, his DVD/VCR player, his Xbox video game system and Xbox games, and his sixty-seven inch television. Hargrave later estimated that the total value of the missing items was approximately $6250.

While Hargrave was in the hospital, the defendant, Hargrave's cousin, conspired with Frederick E. Johansen to burglarize Hargrave's home and to steal property from it. According to Johansen's written statement, given to the police while in custody, the defendant told him that Hargrave had "piles of drugs" in the home,

including prescription Oxycontin and Percocet pills, informed him that he could "take the pills and whatever else you want," and that he "could just go in [to Hargrave's home] because he had someone that would leave the door open" and instructed him to "do it on the fourth."[2] Johansen's written statement also recites that the defendant told Johansen that if he did all the "dirty work, [he] could keep most of the profit," provided only that he gave the defendant "a couple of hundred dollars as kind of a finder's fee."

On the morning of February 4, 2010, Johansen and Victor Kozubenko, drove in Kozubenko's car to Hargrave's home to retrieve the drugs that the defendant had said would be there. On their way, they gave a ride to Rockville to two of their friends, Frederick Colby and his wife, where Colby, a self-confessed drug addict and convicted criminal, was appearing as a defendant in a motor vehicle case. After dropping off the Colbys in Rockville, Johansen and Kozubenko drove directly to Hargrave's home in Ellington.

When Johansen and Kozubenko arrived at Hargrave's home, Johansen initially attempted to enter through the rear door, which he found to be locked, and then attempted to enter the home through the front door, which was also locked. According to Kozubenko's testimony, Johansen said that he had been told that the door would be open, but upon arriving at Hargrave's home, Johansen found, first, that the back door was locked, and next, that the front door was locked as well. Johansen searched for an unlocked window through which to enter the home. Although he found an unlocked window on the side of the home, he was unable to open it on his own. Kozubenko then suggested that Johansen look in the toolbox attached to the bed of a truck parked in the driveway to see if there was anything in there with which to open the window. Finding a screwdriver in the toolbox, Johansen used it to open the side window and gain entrance to the home. He then opened the back door to let Kozubenko enter the residence.

Upon realizing that there were no drugs in the home, Johansen told Kozubenko that he was also "supposed to sell all [of Hargrave's] stuff," and so, on that pretext, he asked Kozubenko if he wanted to buy any of the items in the home. Johansen and Kozubenko then agreed that Kozubenko would give Johansen fifteen Oxycontin pills and $250 in cash in exchange for Hargrave's television, DVD/VCR player, computer, monitor and computer accessories, printer, Xbox and Xbox games and surround sound system. Johansen and Kozubenko then loaded the selected items in Kozubenko's car, and left some items in the garage of Kozubenko's mother's home in Manchester.

After purchasing rope at a hardware store, they drove back to Hargrave's house to retrieve the television. They

placed a blanket on the roof of the car, placed the television on top of the blanket and tied the television in place with the recently purchased rope.[3] With the television on the roof of the car, Kozubenko and Johansen picked up Colby and Colby's wife in Rockville and gave them a ride to Colby's house. When Colby asked Johansen about the television, Johansen explained that "he got it from my sister's house . . . ." Colby testified that he then rode with Kozubenko to his mother's house in Manchester where he helped Kozubenko unload the television, computer and Xbox from Kozubenko's car and take the items into the house.

Colby's written statement to the police reveals that Johansen later explained that he and Kozubenko had stolen the television and other "stuff from [Hargrave's] house." Johansen explained to Colby that "he knew the house was going to be empty because the people were away . . . because [the defendant] told him. . . . [I]t was arranged by the [defendant] . . . ." Colby further explained in his statement that "[a]bout a week after I found out from [Johansen], I heard the same from [the defendant] . . . ."

Several weeks later, the police obtained a warrant to search the home of Kozubenko's mother. Upon executing the warrant, the police found most of the items that had been taken from Hargrave's home and arrested Kozubenko. Shortly thereafter, Johansen was also arrested in connection with the Hargrave burglary and was taken into custody. The defendant was arrested on April 17, 2010, and charged, by way of long form information, with two counts of conspiracy to commit burglary in the third degree in violation of §§ 53a-48 and 53a-103, and two counts of conspiracy to commit larceny in the third degree in violation of §§ 53a-48 and 53a-124. The defendant was also charged, by way of a part B information, with having committed various crimes while on pretrial release in violation of General Statutes § 53a-40b. On May 10, 2011, the defendant pleaded not guilty to the first part of the information and elected to be tried by a jury.

Following trial, the defendant, on June 1, 2011, was convicted of all charges.[4] The court then sentenced the defendant to a total effective term of ten years incarceration, execution suspended after six years, followed by four years probation. This appeal ensued.

I

The defendant first claims that the court abused its discretion in permitting the state to present evidence at trial of his prior misconduct because such evidence was not relevant to any disputed issue in the case, and, even if relevant, the prejudicial impact of this evidence outweighed its probative value. Finally, on this issue, the defendant claims that the court's admission of this evidence was not harmless error. We are not persuaded.

## A

The following additional facts and procedural history are relevant to our resolution of this claim. On May 17, 2011, approximately one week before the start of evidence at trial, the state filed a detailed notice of its intent to introduce evidence of the defendant's prior bad acts against him at trial. Specifically, the state gave notice of its intent to offer evidence that on August 13, 2009, approximately six months before the Hargrave burglary and larceny, the defendant and one of his alleged coconspirators in the present crimes, Johansen, had jointly committed ten car burglaries in Litchfield, as described in an attached police report concerning those offenses and sworn written statements by Johansen and the defendant admitting to them. The state's purposes for introducing such prior misconduct evidence, as disclosed in its notice, were to demonstrate a system of criminal activity between the defendant and Johansen, to prove the elements of the crimes charged against the defendant involving conspiracy, and to establish a relationship between the defendant and Johansen as coconspirators.

The evidence submitted by the state in support of its notice showed, more particularly, that on the day in question, the defendant and Johansen had driven to Litchfield to break into trucks that a third party had told the defendant he would leave unlocked so that the defendant could steal chain saws that were stored inside them. When, however, the defendant and Johansen arrived at the location in Litchfield where the trucks were located, they discovered that there were no chain saws inside them, and so they left the immediate area. Johansen, however, did not want to leave Litchfield empty-handed, so he proposed to the defendant, and the defendant agreed, that Johansen would break into and steal valuables from cars they found in the area while the defendant drove him from the location of one set of cars to the next. Johansen and the defendant were subsequently arrested and charged with several counts of larceny and burglary on the basis of this conduct. The evidence submitted in support of the state's notice also showed that Johansen, in his written statement to the state police following his arrest in connection with the Litchfield car burglaries, stated that on certain previous occasions when he was arrested, he would give stolen goods to the defendant, who would use them to "barter . . . with a bondsman [the defendant] knows so [that Johansen] could get bonded out."[5]

Before the start of the second day of trial, the state argued to the court that the proffered evidence should be admitted because it was relevant and material to demonstrate a system of criminal activity between the defendant and Johansen, to prove the element of intent for commission of the crime of conspiracy against the defendant, and to establish a relationship between the

defendant and Johansen as coconspirators. The state contended that the probative value of this evidence outweighed its prejudicial effect because it would "assist the trier of fact in making a decision as to whether or not a conspiracy existed here between Johansen and [the defendant] . . . ." The defendant countered that the state's sole purpose for introducing this evidence was "to argue that he has the propensity to engage in" criminal acts. The defendant also claimed that the "prejudicial impact [of such evidence] far outweigh[ed] any probative value that it [might] ha[ve] . . . ."

The court ruled that the evidence was admissible to prove the defendant's intent and motive, and that its probative value on those issues outweighed its prejudicial effect.[6] On the basis of this ruling, the state introduced at trial the prior misconduct evidence regarding the Litchfield car burglaries. It introduced testimony of two state police troopers who had taken part in the arrests of Johansen and the defendant, and the sworn postarrest statements of Johansen and the defendant to the state police, admitting the Litchfield car burglaries, were read into the record in their entirety.

Litchfield Resident State Trooper James Holm, a state's witness, testified to the following events regarding the Litchfield car burglaries. In the early morning hours of August 13, 2009, he was dispatched to investigate a report of a series of car burglaries and a suspicious vehicle. When he arrived in the area of the alleged burglaries, Holm and another trooper located the suspicious car, but were unable to find its operator. Thereafter, Holm and several other troopers were dispatched to various homes in response to homeowners' complaints that their cars had been burglarized. Holm was advised that another trooper had located Johansen near the suspicious car, which contained items reported missing from some of the burglarized vehicles. Holm subsequently placed Johansen under arrest, advised him of his *Miranda* rights,[7] and transported him to the state police barracks, where he agreed to provide a sworn written statement in which he inculpated himself and the defendant.

Detective Paul Lukienchuk, the state police trooper who took Johansen's written statement following his arrest on August 13, 2009, read Johansen's statement into the record. In this statement, Johansen explained that he and the defendant had been at a friend's house on the night of August 12, 2009, when the defendant asked if Johansen would help him pick up some chain saws from one of his friends in Litchfield. Johansen claimed that the defendant had said his friend would "leave 4 or 5 [chain saws] outside of a building for him . . . [because] this guy owed him some money." Johansen explained that the defendant "lets people borrow money for an interest charge." Early in the morning

on August 13, 2009, Johansen and the defendant drove in their respective cars to Litchfield, but when they arrived, no chain saws could be found, and so they left the area. Johansen stated that he then "decided that [he] wanted to break into some cars [because he] had used about $15.00 worth of gas and [he] was not going to leave the area with nothing at all." The defendant drove Johansen to "a spot where there were some houses and he parked his car." Johansen explained that the defendant was "supposed to wait for [him] to get back from breaking into the cars." Johansen stated that he broke into about twelve cars in all, stealing items from inside each of them. After Johansen broke into the cars, he made piles of the stolen items on the street to come back and pick up later when he was finished. Johansen claimed to have stolen a knife, a flashlight, an mp3 player, an iPod, a laptop, and a suitcase from the cars. When he was finished breaking into the cars, he returned to where the defendant was supposed to have been waiting for him, only to find that the defendant had left. Johansen then walked back to where he had parked his own car and returned to the area where he had left the piles of stolen items. While Johansen was picking up the stolen items, he was arrested by state police.

In his written statement, Johansen further stated that he had been living with the defendant for about one month at the time of the break-ins but that this was the first time he had "done anything like this with [the defendant]." He admitted in his statement that he had been using heroin for about four months at the time of his arrest. He also explained that when he was arrested on previous occasions, he "would give the stolen items to [the defendant] . . . [who] would then barter these items with a bondsman he knows so that [Johansen] could get bonded out."

On August 13, 2009, the defendant was arrested by state police in Hartford in connection with the Litchfield car burglaries, and was transported to the state police barracks in Litchfield by Holm. Prior to leaving the state police barracks in Hartford, the defendant was read his *Miranda* rights and signed a waiver of rights form. During the drive to the Litchfield barracks, the defendant spoke to Holm about his involvement in the incidents that had occurred that morning. Holm testified at trial that during this conversation, the defendant told him that he had gone to Litchfield with the plan to steal chain saws from trucks belonging to a tree service company that would be left open by someone named "Jeff." When the defendant and Johansen arrived at the location of the tree service trucks, they found that the truck's doors were unlocked, but that no chain saws were inside. The defendant then explained that Johansen said he wanted to go up the street because he knew where there were some vehicles he could break into. The defendant thus drove Johansen up the street

and dropped him off. While Johansen was breaking into vehicles, the defendant drove back and forth, "waiting for Johansen to go into vehicles," so that he could pick him up when he was finished.

Lukienchuk testified that once the defendant arrived at the Litchfield barracks, he took the defendant's written statement, which he read into the record at trial. In his written statement regarding the Litchfield car burglaries, the defendant stated that on August 12, 2009, someone named "Jeff," who owns a tree cutting business, had offered to pay him $200 for one day of work, but that the defendant would "ha[ve] to do something else for him first." Jeff explained that he wanted the defendant to "rob another guy who had ripped him off" by stealing chain saws from some trucks owned by the person who had "ripped off" Jeff. Jeff instructed the defendant that he "would unlock all of the locks and doors on the trucks," and that "after [the defendant] stole the [chain saws] . . . [he should] slash some of the truck tires." Jeff offered to buy the stolen chain saws from the defendant, which he valued at about $8000, for $3000. The defendant "agreed to this arrangement," and thus planned to meet Jeff at 2 a.m. on the next morning, August 13, 2009.

In his written statement, the defendant further stated that Johansen had said that he "wanted to go break into some cars" in order to "make some real money." The defendant thus drove Johansen "to a location where there were some houses with cars in the driveway" and dropped off Johansen. The defendant then left the immediate area and parked his car down the street, where he stayed until he heard "a banging noise in the distance," which caused him to return at once to the area where he had dropped off Johansen and to yell for him to get in the car. The defendant saw that Johansen was "now carrying a flashlight that [he] had not seen him with earlier." They drove about one mile away, and the defendant again dropped off Johansen so that he could break into more cars. While waiting for Johansen to return, the defendant "saw a car coming down the street with [its] hazard lights flashing," and was "concerned that this [might have been] someone looking for" him and Johansen. The defendant "got scared and drove away, leaving [Johansen] behind." He returned to the area three times looking for Johansen and on one occasion saw a police car in the area. After several unsuccessful attempts to locate Johansen, he left the area and returned home.

In addition to introducing the defendant's and Johansen's statements at trial through Lukienchuk, the state also questioned Johansen about his involvement in the Litchfield car burglaries. In his testimony, Johansen, in the main, affirmed the portions of the statement he had given to the police following his arrest in connection with the Litchfield car burglaries regard-

ing his own culpability but he recanted the portions in which he had implicated the defendant. Johansen testified that on August 13, 2009, he drove to Litchfield with the defendant to "pick . . . something up from . . . somebody he knew," but that when they arrived, the "stuff . . . wasn't there," so Johansen "started [burglarizing] cars." Johansen asserted, contrary to his statement to police, that the defendant had given him a ride, but that the defendant was not involved in the car burglaries. Johansen also denied that he had burglarized the cars in Litchfield in order to repay the defendant with stolen goods for the debt he owed him for previously bailing him out of jail.

At trial, the court gave limiting instructions to the jury regarding the use of the prior misconduct evidence. Following the testimony of Holm regarding the Litchfield car burglaries, the court sua sponte gave the following limiting instruction to the jury: "Holm, who testified to events in Litchfield and a conversation with the defendant, and—I assume—the next witness [Lukienchuk]—are testifying to alleged misconduct on the part of the defendant. And that is offered only on the issue of the defendant's intent or motive in the crimes that you are presently going to decide or decide next week. We don't offer or allow to be offered evidence to prove the bad character of the defendant or his tendency to commit criminal acts. Such evidence of misconduct is only offered on the defendant's intent and motive concerning the four charges that you will be deciding next week. You may not consider the evidence from Trooper Holm or any of the other evidence that has come out about the defendant's misconduct or the defendant's activities in Litchfield—even if you believe that evidence—as establishing a predisposition on his part to commit any of the crimes currently charged or to demonstrate a criminal propensity. Of course, if you don't believe the evidence or even if you do, if you find it does not logically, rationally, and conclusively support the issues on which it is offered, to wit, motive and specific intent—that will be defined for you in great detail—then you may not consider that testimony for any purpose."

Additionally, before the statements of Johansen and the defendant were read into the record by Lukienchuk, the court, sua sponte, provided the jury with another limiting instruction regarding its use of this evidence: "[T]he information contained in [Johansen's] statement, even if believed by you, is entered—as is the information on [state's exhibit] 56, which purports to be [the defendant]'s statement—for the limited purpose that I have just spoken to you about on some other evidence that came in, particularly through Trooper Holm. That is, when evidence of other misconduct of the defendant is being offered, it is not admitted to prove bad character or the defendant's tendency to commit criminal acts. In this case, such evidence is being admitted solely to

show or establish the defendant's intent and motive in the cases that currently are on trial, the four charges that you will have to consider next week. You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the currently charged crimes or to demonstrate a criminal propensity. You may consider such evidence if you believe it and further find that it logically, rationally, and conclusively supports the issues for which it is being offered by the state, to wit, the defendant's intent on each of these conspiracy counts and accessory or accomplice counts. If you don't believe such evidence or you don't find it logically, rationally, and conclusively supports the issues on intent and motive, then you may not consider that testimony for any purpose."

In addition to its limiting instructions during the taking of evidence at trial, the court, in its final jury charge, reiterated that "some testimony and exhibits have been admitted for limited purposes. Wherever I have given you a limiting instruction, you must follow it." The court further instructed the jury during its final instructions that the evidence of the defendant's prior acts of misconduct, "is being admitted solely to show or establish the defendant's intent and motive for the commission of the crimes alleged. You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and further find that it logically, rationally, and conclusively supports the issues for which it is being offered by the state but only as it may bear upon the issues of the defendant's intent and motive for the commission of the crimes alleged. On the other hand, if you don't believe such evidence, or even if you do, if you find that it does not logically, rationally, conclusively support the issues for which it is being offered by the state—namely, the defendant's intent or motive for the commission of the crimes alleged—then you may not consider that testimony for any purpose."

Regarding Johansen's statement to Lukienchuk concerning the Litchfield car burglaries, the court stated: "Since it concerns the alleged prior misconduct by the defendant, it has been admitted only on the issues of the defendant's intent and motive concerning the currently pending charges under the heading misconduct of defendant on pages 5 and 6 of [the] instruction[s].

"Similarly, exhibit 56, the defendant's statement, is admitted only on the issue of his misconduct and may be considered by you—prior misconduct, I should say— and may be considered by you only on the issues of intent and motive under all the guidelines and limitations in that instruction. Again, I refer you back to pages 5 and 6."[8]

B

At the outset of our analysis of the defendant's evidentiary claim regarding prior misconduct, we note, as a general proposition, that in reviewing claims of evidentiary impropriety, we accord the trial court's ruling substantial deference. As stated by our Supreme Court, "It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence . . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Furthermore, [i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion. . . . Despite this deferential standard, the trial court's discretion is not absolute. . . . Thus, [i]n reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Citations omitted; internal quotation marks omitted.) *State* v. *Jacobson*, 283 Conn. 618, 626–27, 930 A.2d 628 (2007).

With those tenets in mind, we turn now to the defendant's specific evidentiary claim that the evidence of the Litchfield car burglaries was improperly admitted to prove his intent and motive to commit the charged offenses. "As a general rule, evidence of guilt of other crimes is inadmissible to prove that a defendant is guilty of the crime charged against him. . . . The rationale of this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged." (Citations omitted; internal quotation marks omitted.) *State* v. *Braman*, 191 Conn. 670, 675, 469 A.2d 760 (1983). The fact that such evidence, however, tends to prove the commission of other crimes by an accused does not render it inadmissible if it is otherwise relevant and material. Id., 675–76; see also *State* v. *Ibraimov*, 187 Conn. 348, 352, 446 A.2d 382 (1982); *State* v. *Hauck*, 172 Conn. 140, 144, 374 A.2d 150 (1976); *State* v. *Marshall*, 166 Conn. 593, 600, 353 A.2d 756 (1974). Such evidence may be admitted for other purposes, such as to show intent, an element in the crime, identity, malice, motive or a system of criminal activity. *State* v. *Ibraimov*, supra, 352; *State* v. *Falby*, 187 Conn. 6, 23, 444 A.2d 213 (1982); *State* v. *Brown*, 169 Conn. 692, 701, 364 A.2d 186 (1975).[9]

"Our analysis of whether evidence of the uncharged

misconduct is admissible is two-pronged. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions to the propensity rule. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crimes evidence. . . . The primary responsibility for conducting the prejudicial-probative balancing test rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion. . . . [W]e will indulge in every reasonable presumption in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 162, 665 A.2d 63 (1995).

The defendant argues that the court abused its discretion by permitting the state to present prior misconduct evidence at trial relating to the Litchfield car burglaries. In response, the state contends that evidence of the defendant's prior misconduct with Johansen was probative of his motive and intent to commit the crimes of which he was convicted in the case at hand. Specifically, the state argues that the defendant's prior dealing with Johansen in the Litchfield car burglaries, which involved some acts of parallel behavior in terms of the relationship between Johansen and the defendant in the manner in which the underlying crimes were committed, provided some evidence of the defendant's motive and intent to commit the subject crimes with Johansen. We agree with the state.[10]

As noted, the defendant was charged in four counts with conspiracy to commit burglary and conspiracy to commit larceny, and with being an accessory to burglary and to larceny. To prove the defendant's guilt of each of these crimes, the state was required to demonstrate the defendant's specific intent to commit these crimes. In support of the conspiracy counts, the state was required to prove that the defendant, as a conspirator, had the intent to conspire with Johansen, enter into an illegal agreement and, further, that they had the intent to commit the elements of the underlying offenses of larceny and burglary. See *State* v. *Jones*, 44 Conn. App. 338, 342–43, 689 A.2d 517, cert. denied, 240 Conn. 929, 693 A.2d 301 (1997). In sum, and as noted previously by a panel of this court, conspiracy is a specific intent crime with intent divided into two components: a person must intend to agree or conspire with another, and that person must also intend to commit the offense which is the subject of the conspiracy. See *State* v. *Douglas*, 126 Conn. App. 192, 202, 11 A.3d 699, cert. denied, 300 Conn. 926, 15 A.3d 628 (2011). So, too, in order to prove the defendant guilty of the underlying crimes of larceny and burglary, the state was required to prove that the defendant had the specific intent to enter the Hargrave home with criminal intent to steal.[11] Thus, all of the criminal conduct charged by the state required proof of the defendant's intent.

The state argues, as well, that the admission of evidence of the defendant's past misconduct with Johansen provided some evidence of the defendant's motive to entice and conspire with Johansen to commit the Hargrave burglary and larceny because Johansen was indebted to the defendant, who had previously posted bail for him due to past arrests. As noted, at trial, the jury heard from Johansen that he was indebted to the defendant before February 4, 2010, and that when the defendant conspired with him for the commission of the burglary and larceny, the defendant indicated that he would expect a small finder's fee. Although the defendant argues that there was no evidence that Johansen repaid him, Johansen's failure to satisfy that obligation to the defendant serves only to create an implication that the defendant's financial motive in enticing Johansen may not have been realistic and that his expectation may not have been fulfilled.

Accordingly, evidence probative of the defendant's intent and motive was relevant to the state's burden of proof at trial. "[E]vidence is relevant if it has a tendency to establish the existence of a material fact." (Internal quotation marks omitted.) *State* v. *Smith*, 42 Conn. App. 41, 49, 680 A.2d 1340 (1996). As a panel of this court has previously noted, "[b]ecause intent is almost always proved, if at all, by circumstantial evidence, prior misconduct evidence, where available, is often relied upon. . . . [E]xtrinsic act evidence is often a useful source of circumstantial evidence of what a person's mental state was on the occasion in question . . . . Evidence is relevant if it has a logical tendency to aid the trier in the determination of an issue. . . . All that is required is that the evidence tend to support a relevant fact *even to a slight degree*." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Irizarry*, 95 Conn. App. 224, 234–35, 896 A.2d 828, cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006); see also *State* v. *Kalil*, 136 Conn. App. 454, 463–65, 46 A.3d 272 (2012), to the same effect. We do not fault the court in its determination that this evidence of motive and intent was relevant.

We next address whether the court properly concluded that the prior misconduct evidence was more probative than prejudicial in ruling that the evidence could be admitted at trial. When weighing the admissibility of relevant prior misconduct evidence, a trial court is required to conduct a further balancing assessment of whether the evidence is more prejudicial than probative. This inquiry is required in order to militate against the risk that the attention of a jury may be distracted from consideration of the proof of the charges at hand, and, instead, and for improper reasons, fix the defendant's guilt on evidence of marginal evidentiary value. "Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates

undue prejudice so that it threatens an injustice were it to be admitted. . . . The court bears the primary responsibility for conducting the balancing test to determine whether the probative value outweighs the prejudicial impact, and its conclusion will be disturbed only for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Douglas*, supra, 126 Conn. App. 219. In balancing whether evidence is more prejudicial than probative, "[t]he test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury." (Internal quotation marks omitted.) *State* v. *Smith*, 275 Conn. 205, 218, 881 A.2d 160 (2005).

Put differently, as our Supreme Court stated in *State* v. *James G.*, 268 Conn. 382, 399, 844 A.2d 810 (2004), "[U]ndue prejudice is not measured by the significance of the evidence which is relevant but by the impact of that which is extraneous." (Emphasis omitted; internal quotation marks omitted.) The court in *James G.* observed that there are certain situations in which the potential prejudicial effect of relevant evidence would suggest its exclusion. They are: "(1) where the facts offered may unduly arouse the jur[ors'] emotions, hostility of sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Emphasis omitted; internal quotation marks omitted.) Id., 398.

None of the facts noted by the court in *James G.* is present in this case. The prior misconduct, though criminal, did not involve the sort of criminal behavior likely to incite the passions of a jury; the evidence of the defendant's involvement in the Litchfield burglaries and larcenies consisted of the defendant's and Johansen's admissions of culpability. Thus, the state did not have to derail the present trial with a side issue or spend an inordinate amount of trial time in order to prove the prior misconduct. Finally, because the state filed its notice of intention regarding this evidence before the start of trial, the defendant can make no claim of surprise or lack of preparedness.

In assessing the trial court's determination that the evidence was more probative than prejudicial, we also note that the trial court gave limiting instructions to the jury during the trial testimony and, as well, gave the jury oral and written instructions sculpting the jury's use of this evidence. Where the record reflects that the court has "minimized any potential undue prejudice [caused by the admission] of the prior misconduct evidence by giving the jury detailed limiting instructions as

to the role the evidence was to play in its deliberations";
*State* v. *Kalil*, supra, 136 Conn. App. 469; we have considered that fact significant in determining whether the court properly conducted the probative versus prejudicial balancing test before admitting prior misconduct evidence. See also *State* v. *Douglas*, supra, 126 Conn. App. 221. As noted, the record reflects that with respect to the defendant's prior misconduct, the court gave the jury extensive limiting admonitions during the trial and included detailed instructions on this topic in its postevidentiary written and oral instructions to the jury. "Absent evidence to the contrary, we presume that the jury followed the court's limiting instruction." *State* v. *Messam*, 108 Conn. App. 744, 758, 949 A.2d 1246 (2008).

On the basis of our thorough analysis of the record and applicable decisional norms, we do not conclude that the court's admission of evidence of the defendant's prior misconduct was an abuse of discretion or resulted in a manifest injustice.

II

The defendant next claims that his conviction of certain charges violated his constitutional right against double jeopardy. In his reply brief and at oral argument before this court, however, the defendant subsequently withdrew certain aspects of this claim. He did so specifically because the state conceded that the failure to merge the conviction of conspiracy to commit larceny in the third degree with the conviction of conspiracy to commit burglary in the third degree violated principles of double jeopardy, and because the court later granted his motion to correct an illegal sentence and vacated without prejudice the conviction of one of the two conspiracy counts.

Thus, the only issue before us with regard to this claim is whether the conviction of the conspiracy and accessory charges violated the defendant's constitutional right against double jeopardy. The defendant acknowledges that this issue has been decided by our Supreme Court in *State* v. *Johns*, 184 Conn. 369, 378–79, 439 A.2d 1049 (1981), in favor of the state and that he cannot distinguish the facts of his case from the relevant legal precedent. In *Johns*, our Supreme Court held that "[i]t is evident that the statutory framework for each offense, i.e., the crime of accessory to burglary in the third degree and conspiracy to commit burglary in the third degree, requires proof of a fact which the other does not. . . . The elements of these crimes are different." (Citations omitted; internal quotation marks omitted.) Id. Thus, we conclude, as to the portion of the defendant's claim that was not withdrawn, that his conviction of the conspiracy and accessory to burglary and larceny charges did not violate his constitutional right against double jeopardy.

III

The defendant has waived his final claim that the court's instructions to the jury on the charge of conspiracy were prejudicially erroneous. Our Supreme Court has held that, "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011). Here, counsel for the state and the defendant were provided with the court's proposed instructions, and were afforded the opportunity to review them and express their concerns and suggested changes to the court at a charging conference held on May 27, 2011. At no time during the charging conference did the defendant's counsel challenge the court's instructions on the elements of conspiracy. Because the defendant did not challenge these instructions at trial, we deem this claim waived.

The judgment is affirmed.

In this opinion LAVINE, J., concurred.

[1] For ease of reference, we refer to Gerald Hargrave as Hargrave.

[2] Both Johansen and Frederick Colby gave written statements to the police, while in custody, in which they implicated the defendant in the commission of the burglary and larceny of Hargrave's home. At trial, both Johansen and Colby, who were called as witnesses by the state, recanted portions of their written statements and testified, contrary to their statements, that the defendant was not involved. Johansen and Colby were held in nearby holding cells in the lockup of the Manchester Police Department. Johansen had been arrested in connection with the Hargrave burglary, and Colby had been arrested in connection with an unrelated series of car burglaries. Colby testified that, when they were in nearby holding cells, Johansen devised a plan to lower his own bond by giving the police a false statement implicating the defendant in the Hargrave burglary and having Colby corroborate that statement by giving his own sworn statement confirming the false allegations. Colby testified that Johansen instructed him to tell the police "that [the defendant had] told [Johansen] how to get in" to Hargrave's house. The two men purportedly agreed to this plan in the course of several conversations they had with each other through the bars of their jail cells in Manchester. At trial, Johansen testified that he had "filed a false statement" against the defendant because he "was upset" with the defendant for having sold his car to satisfy an outstanding debt that he had owed to the defendant. Johansen testified, contrary to his written statement that, in actuality, the defendant "had nothing to do with the crime at all." He further testified that at the time he gave his statement to the police, he was under the influence of Xanax.

After Johansen's and Colby's testimony, in which they stated that the defendant was not involved, their written statements implicating the defendant in the burglary were admitted into evidence pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Thus, the substance of their written statements came into evidence not only to impeach Johansen and Colby but, substantively, as proof of the defendant's guilt.

[3] As part of the state's case, the jury heard testimony from Ellen Riemer, an Ellington neighbor of the Hargraves, who drove by the home at approximately 11:30 a.m. on February 10, 2010. She testified that she observed a car in the Hargraves' driveway and two men who appeared to be securing a tarp to the top of the car. She stated that when she made eye contact with the individuals, "they sort of looked back at me." She indicated, as well, that neither of the men ran when she saw them or took any other

furtive action At trial, Johansen testified that he first went to the back door to avoid detection and not because the defendant had told him a door would be left open for him. In assessing the veracity of Johansen's recanting of his *Whelan* statement implicating the defendant, the jury could give consideration to the incongruity of the behavior of Johansen and Kozubenko, securing the fruits of their larceny in plain sight of this passerby with Johansen's claim, at trial, that he first went to the back door in order to avoid detection.

[4] While the record discloses that the defendant had also been charged with a part B information and the court stated that the state had proven its part B allegations, the court did not expressly make a finding of guilt regarding part B of the information. Rather, the court indicated that it would take the defendant's past criminal convictions into account in formulating its sentence.

[5] Johansen testified at trial that at the time of the Hargrave burglary, he still was indebted to the defendant for having previously bailed him out of jail.

[6] We draw no inference from the absence, in the court ruling, of any discussion of its reasoning in concluding that the misconduct evidence was relevant to intent and motive. Nor do we draw any inference from the absence, in the record, of any discussion by the court of the factors it considered in conducting the balancing test regarding whether the evidence was more prejudicial than probative. Because the defendant did not request an articulation by the court, we presume, as the court is entitled, that the court properly fulfilled its responsibilities in this part of the trial proceedings. In sum, although the court did not explicitly discuss the basis of its ruling that the evidence was relevant to motive and intent or its reasoning regarding the balancing test, we will not infer error from this silence because "the court is presumed to know the law and apply it correctly to its legal determinations." (Internal quotation marks omitted.) *State* v. *Kuncik*, 141 Conn. App. 288, 295, 61 A.3d 561, cert. denied, 308 Conn. 936, 66 A.3d 498 (2013).

[7] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[8] The court's written instructions, given to the jury for reference during deliberations, include the following regarding the evidence of the defendant's prior misconduct: "Misconduct of Defendant. The state has offered evidence of other acts of misconduct of the defendant. This is not being admitted to prove the bad character of the defendant or the defendant's tendency to commit criminal acts. Such evidence is being admitted solely to show or establish the defendant's intent and motive for the commission of the crimes alleged. You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and further find that it logically, rationally and conclusively supports the issues for which it is being offered by the state, but only as it may bear on the issues of intent and motive. On the other hand, if you do not believe such evidence, or even if you do, if you find that it does not logically, rationally and conclusively support the issues for which it is being offered by the state, namely, intent and motive, then you may not consider that testimony for any purpose. You may not consider evidence of other misconduct of the defendant for any purpose other than the ones I've just told you, because it may predispose your mind uncritically to believe that the defendant may be guilty of the offense here charged merely because of the alleged other misconduct. For this reason, you may consider this evidence only on the issues of intent and motive, and for no other purpose."

[9] In Connecticut, the general rule is embodied in § 4-5 of the Connecticut Code of Evidence, which is entitled "Evidence of Other Crimes, Wrongs or Acts Inadmissible to Prove Character; Admissible for Other Purposes; Specific Instances of Conduct." That section provides: "(a) Evidence of other crimes, wrongs or acts inadmissible to prove character. Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person.

"(b) When evidence of other crimes, wrongs or acts is admissible. Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." Conn. Code Evid. § 4-5.

[10] At trial, the state argued that the prior misconduct evidence was admissible to prove the defendant's relationship to Johansen. Although the court permitted the evidence only to prove intent and motive, we are aware of

substantial decisional law opining that a defendant's past relationship with another may be admitted in a conspiracy prosecution. See, e.g., *State* v. *Jones*, 46 Conn. App. 640, 652, 700 A.2d 710 (when defendant charged with conspiracy, prior misconduct evidence admissible to establish relationship between defendant and coconspirators), cert. denied, 243 Conn. 941, 704 A.2d 797 (1997); see also *State* v. *Harris*, 43 Conn. App. 830, 836–37, 687 A.2d 544 (1996) (when defendant charged with conspiracy to commit murder, evidence of drug operation admissible to show relationship among various individuals).

In the case at hand, evidence of the defendant's past relationship with Johansen in the commission of the Litchfield car burglaries was relevant to the issue of intent. That is, such evidence is not admitted to prove relationship as an end; rather, the relationship between the defendant and another actor in past misconduct is some evidence of the defendant's intent to conspire with that same person. Contrary to the defendant's claim, the evidence is not admitted to prove the defendant's propensity to commit crimes; rather, it provides some evidence of an intent to form a conspiracy with that particular person. Additionally, the risk that it could be taken as propensity evidence was mitigated, as noted previously, by the court's thorough limiting and final instructions to the jury.

[11] In this regard, it is not legally relevant that the defendant did not intend to enter the home himself but, rather, that he intended for Johansen to do so. Accessorial culpability may be imposed on the basis of advice and impulse given to Johansen by the defendant.

General Statutes § 53a-8 (a) provides that the requirements for accessorial liability are as follows: "[a] person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."